802 So.2d 533 (2001)
STATE of Louisiana
v.
Jimmie C. DUNCAN.
No. 99-KA-2615.
Supreme Court of Louisiana.
October 16, 2001.
Rehearing Denied November 16, 2001.
*537 John H. Holdridge, Walter L. Perkins, Jr., Louis G. Scott, Counsel for Applicant.
Richard P. Ieyoub, Attorney General, Jerry L. Jones, District Attorney, Earl *538 Cox, Susan E. Hamm, John M. Ruddick, Counsel for Respondent.
LOBRANO, Justice Pro Tem.[*]
This is a capital case. On January 10, 1994, an Ouachita Parish grand jury indicted the defendant, Jimmie Christian Duncan, for first degree murder in violation of La.Rev.Stat. 14:30. On April 7, 1998, a jury found defendant guilty as charged and, after a sentencing hearing, unanimously recommended the death sentence. At the penalty phase of the trial, the jury returned the following three aggravating circumstances: (1) that the victim was under the age of twelve, (2) that the killing occurred during the perpetration or attempted perpetration of aggravated rape, and (3) that the killing was done in an especially heinous, atrocious, and cruel manner. La.C.Cr.P. art. 905.4(A)(1), (7), and (10). Asserting 125 assignments of error variously combined into 27 arguments,[1] defendant directly appeals his conviction and sentence. La. Const. Art. V, § 5(D). Finding no merit in any of these arguments, we affirm.

Facts
In December 1993, defendant, then twenty-five years old, shared an apartment on Copley Street in West Monroe with his girlfriend, Allison Oliveaux, and her twenty-three month old daughter from a prior marriage, Haley Oliveaux. On Saturday, December 18, 1993, that apartment became a crime scene.
Around 8:30 a.m., Allison left for work, leaving Haley and defendant home alone. Later that morning, around 9:45 a.m., a neighbor, Floyd Bennett, was outside playing basketball with his son when he witnessed defendant walk in the direction of a nearby local store and return smoking a cigarette. During defendant's absence, Floyd Bennett could see both entrances to the apartment and saw no one exit or enter.
Around 10:30 a.m., defendant knocked on the Bennett's door carrying Haley's lifeless body wrapped in a towel. Responding to defendant's plea for assistance in reviving the child, Wynette and Floyd Bennett, working as a team, began cardiopulmonary resuscitation (CPR) while their son called 911. When Floyd Bennett cleared Haley's throat to commence CPR, he found what appeared to both him and his wife to be uncooked oatmeal. Within minutes, Detective Shane Harris of the West Monroe Police Department responded to the 911 call. Detective Harris relieved the Bennetts and continued the efforts to resuscitate the child. Both Detective Harris and the Bennetts described Haley's body as unusually cold to touch, purplish in color, and lacking a pulse; they also observed small red marks on the child's face as they attempted to revive her.
Almost immediately after Detective Harris relieved the Bennetts, paramedics arrived and took over the CPR efforts. At the paramedics request, Wynette Bennett escorted defendant, who was hysterical, out of the house and onto the porch. On the porch, defendant told Wynette Bennett that he had left Haley in the bathtub and was doing dishes in the kitchen. Later, he heard a loud noise and returned to find Haley face down, drowned in the tub. Immediately, he brought her next door. Defendant told Floyd Bennett the same story later that morning at the hospital.
*539 The Bennetts noted two things that made them suspicious of defendant's accidental drowning story. One was that defendant took the time to wrap a towel around the baby. As Mrs. Bennett put it, "if that had been my baby and she had drowned in the bathtub I would have never took the time to pick a towel if I didn't know CPR." The other was the apparently uncooked oatmeal that they cleared from Haley's throat when they began CPR.
Once he was relieved by the paramedics, Detective Harris went outside on the porch to speak to defendant in an attempt to learn the circumstances that led to the emergency. After repeated requests, defendant responded that he was home washing dishes, and Haley was in the bathtub eating oatmeal and playing with toys. After awhile he stopped hearing Haley make any kind of noise. When he went to check on her, he found her laying face up in the bathtub motionless.
Sergeant Willis of the West Monroe Police Department was also dispatched to the scene, but when he arrived Haley was being placed in the ambulance. Sergeant Willis thus proceeded to the hospital. At the hospital, the victim's relatives were voicing intense hostility towards defendant and posing questions at defendant regarding what he had done to the child. To avoid a confrontation, Sergeant Willis took defendant to the police station; defendant voluntarily went with him.
The emergency room records reflect that on arrival at the hospital Haley had no sign of cardiac activity. Extensive efforts to revive the child proved unsuccessful. At 11:15 a.m., Haley was pronounced dead.
Detective Chris Sasser was the principal investigating officer assigned to the case. After photographing the crime scene, Detective Sasser went to the hospital and examined and photographed the victim's body. He noticed what appeared to be several bruises and then rolled the child on her side and observed extensive injuries to her anus. Armed with this information, Detective Sasser returned to the West Monroe Police Department where he and Chief LaBorde extensively questioned defendant. That day, defendant gave two recorded statements; one at 2:02 p.m., the other at 3:45 p.m. Before doing so, defendant was advised of his constitutional rights and executed a written waiver of his rights. In both statements, defendant told a variant of the accidental drowning story he related earlier that day to the Bennetts and Detective Harris. At trial, both statements were admitted.[2]
In the first statement, defendant described the morning as uneventful. He stated that after Allison left to work, which was around 8:30 a.m., he got Haley up out of bed. His plans for the morning, in addition to babysitting Haley, were to clean the house. He fed Haley some oatmeal, began picking up, and put her in the tub to take a bath. While he was cleaning up the den, Haley called to him, and she had defecated in the bathtub. After he cleaned her off, he ran some fresh bath water and put her back in the tub. At this point, he went into the kitchen and began washing dishes. When he heard her splashing in the tub, he went to check on her and found her unresponsive in the tub. He unsuccessfully attempted to administer CPR, but was not familiar with the process so he decided to go next door for assistance. *540 He grabbed the child and ran next door to see if someone there could render medical assistance to the child. In his rush to get out the house, he fell over some blankets he had left in the hall.
The second statement, according to Detective Sasser, was taken to record defendant's response to questioning regarding how the anal injuries occurred. At one point in the second statement, defendant stated that he jerked Haley out of the tub by grabbing her by the neck and by the buttocks. At another point, defendant stated that he was still holding Haley's body in that fashion when he tripped on a blanket while rushing out the apartment. At yet another point, the following exchange took place:
Q: ... We questioned you later about... marks on her buttocks area. Swelling and a large ... her rectum being ... exposed or open. Did you give Chief LaBorde an explanation of that a few minutes ago?
A: Yes, sir.
Q: What reason ...
A: I just, you know, the only thing did was I washed her. I washed her little butt. I washed around her little butt hole. She had crap smeared on her.
In one of the statements, defendant indicated that he spent the prior night, Friday, December 17, 1993, watching a movie at the apartment with Allison and some friends. One of those friends, Ginger Ford, elaborated on the events of the prior night; she testified that they spent the night watching the movie Raising Cain, drinking, and smoking marijuana. She further testified that defendant pestered Allison that night to go to her mother's house and get Haley, knowing that Allison had to go to work in the morning and that he would have to babysit Haley. Allison, however, testified that her mother wanted her to pick Haley up that night so that on Saturday she could go Christmas shopping. In any event, at about 8:00 p.m. that night, Allison picked Haley up from her mother's house. When they arrived at the apartment, Haley told everyone goodnight and went to sleep. At trial, Allison testified that when she left for work about 8:15 to 8:30 a.m. the next morning, Haley was fine and told her good bye.
Similarly, defendant, in his recorded statements, indicated that earlier that morning Haley had appeared normal playing and watching televisionand that he noticed nothing wrong with her except that her bottom appeared a little pink when he was cleaning her after her bowel movement in the tub. Defendant acknowledged that no one else was present in the apartment that morning.
After the victim was pronounced dead, her body was transferred to Jackson, Mississippi for an autopsy. Dr. Stephen Hayne, a pathologist, performed the procedure and noted acute injuries to the child, including the severe tearing of the anus.[3] Dr. Hayne found in the child's stomach neither any pill fragments, nor any oatmeal. The autopsy report listed the cause of death as fresh water drowning, which finding was found to be supported by the following five factors: (1) absence of clotting of the blood, (2) foam in the distal trachea and right and left main-stem bronchie, *541 (3) presence of water within the stomach, (4) hemorrhage of the right and left petrous ridges, and (5) absence of other causes of death.
Dr. Hayne testified in detail about the anal injuries suffered by the victim, claiming that they would have caused severe bleeding and that the lack of blood on her exterior suggested that she had been washed before being brought to the hospital. He also stated that based on the observations of the Bennetts and Dr. Charles Norwood, the emergency room physician who treated the victim, he believed that Haley was dead for at least forty-five minutes before she arrived at the hospital. Tracing back, this placed the time of death well before defendant left his apartment to seek assistance.[4]
The state's evidence also included testimony from Dr. Edward Gustavson, a pediatrician, who testified that this was the worst case of anal sexual abuse that he had ever seen. Dr. Gustavson also testified as to the amount of bleeding the wounds would have caused and the suffering endured by the victim before her death. Dr. Gustavson testified unequivocally that the victim had been anally raped.
The defense pathologist, Dr. Robert Kirschner, also concluded that the victim had died as a result of an assault, but stated that her anal injuries could have occurred up to twenty-four hours before her death. However, on cross-examination, Dr. Kirschner conceded that the injuries would have been extremely painful and would have been evident from the victim's demeanor immediately after being inflicted.
A hotly contested issue at trial, on which extensive testimony was taken, was whether certain wounds on the victim's body were bite marks inflicted by defendant during the course of the assault. The first suggestion of bite marks on the victim was made by Dr. Hayne during his autopsy. In order to explore the possible bite mark evidence, Dr. Hayne called in Dr. Michael West, a forensic odontologist, to evaluate the child's body. To make the comparison of the possible bite marks to defendant's bite, Detective Sasser obtained a search warrant for defendant's oral cavity. Pursuant to this warrant, defendant was taken to a local dentist who took the impressions, which were then turned over to Dr. West for purposes of making the comparison.
Before trial, the state (apparently concerned over that doctor's past ethical problems) replaced Dr. West and retained Dr. Neal Reisner, another forensic odontologist. As discussed in more detail elsewhere in this opinion, Dr. Reisner, testified with varying degrees of certainty that wounds found on the victim's cheek, neck and elbow were caused by defendant's teeth. In contrast, defendant's expert, Dr. Edward Souviron, a forensic odontologist, testified that none of the markings on Haley's body were bite marks. Dr. Souviron testified that his opinion was premised, at least in part, on the fact that all of these marks were single-archs, i.e., lacked corresponding teeth prints, and his opinion that such single-arch bite marks are rare. The defense forensic pathologist, Dr. Kirschner, also testified "to a reasonable medical certainty" that the injuries were not bite marks.
The state originally planned to charge defendant with negligent homicide. Upon receiving a report from the Mississippi pathologist that conducted the autopsy regarding *542 the extensive and intentional nature of the injuries inflicted on Haley, including the possible bite marks, the state elevated the charges to be asserted against defendant to first degree murder.
The state's case was built on circumstantial evidence. A thorough search of the crime scene revealed neither blood nor semen. Nor was any blood found on defendant's body or attire. The only direct link the prosecution was able to make between the victim's injuries and the defendant was premised on the bite mark evidence.
The state's most telling witness was Michael Cruse, an inmate who on December 28, 1993, briefly shared a cell with defendant. That day, Cruse testified that he woke to find defendant "ranting and raving about [his] charge." Cruse told defendant "[I]f you are innocent then justice will prevail but if you are guilty then you need to talk to God...." Defendant then began sobbing and made rambling statements to Cruse, telling him that "the baby was pointing at his penis and that he said something about a bottle or bobble." Further, defendant said "[t]hat it must of been the devil in him cause the next thing he knew he blacked out again and when he came to he was trying to have sex with the baby." Still further, defendant said that the baby was hysterical and that "all I wanted was the baby to stop."
The defense theory at trial was that someone else was responsible for assaulting Haley. Among the possible suspects the defense sought to explore were Allison; a suspected child molester that lived in the same neighborhood, Robert Haber; and Allison's parents, the Layton's. Another possibility the defense explored was that Haley, who had been taken twice to the hospital during the previous few months for possible seizures, drowned as a result of a seizure induced by a reaction to either drugs or an assault. Defendant did not testify at trial.
The jury found defendant guilty as charged and sentenced him to death by lethal injection.
On this direct appeal, defendant does not dispute that Haley drowned and that she "experienced significant trauma" to her anus. Defendant, however, does dispute multiple other matters. Of those disputed matters, we find two worthy of full-blown opinion treatment; namely: (1) alleged Batson-J.E.B. violation, and (2) exclusion of demonstrative bite-mark evidence.

DISCUSSION

(1) Batson-J.E.B. violation
Defendant, a Caucasian-American male,[5] argues that the state impermissibly exercised its peremptory challenges in a discriminatory manner to strike African-American jurors solely on the basis of race and female jurors solely on the basis of gender in violation of the principles set forth in Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and J.E.B. v. Alabama ex rel. T.B., 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994), respectively. In support of this position, defendant cites only bare statistics.[6] As a *543 remedy, defendant initially requested that we remand for an evidentiary hearing at which the prosecutor would be required to articulate neutral reasons. Citing the trial judge's subsequent retirement[7] and this court's recent decision in State v. Myers, 99-1803 (La.4/11/00), 761 So.2d 498, defendant now requests that we remand for a new trial.
The state counters that the trial court did not err in failing to require it to articulate neutral reasons given that discrimination cannot be inferred from the facts of this case. Bolstering its position, the state relies on the ultimate gender-mixed composition of the juryfive Caucasian-American females, six Caucasian-American males and one African-American male. The state also relies on the fact that when defendant's objection was made the state had used only eight of its twelve allotted peremptory challenges; this fact, the state urges, has both factual and legal significance. The factual significance is that "had the state been purposefully discriminating against any suspect or cognizable group [race or gender], it certainly had the opportunity to remove some of the jurors that actually sat on the jury." The legal significance is that the nature of this casea capital casemandated the verdict be unanimous. In further support of its position, the state quotes the Batson court's comment regarding its confidence in the trial judge's experience in supervising voir dire and in deciding when the prosecution's use of peremptory challenges creates a prima facie case of discrimination. Thus, the state submits that the trial court's ruling that defendant failed to establish a prima facie case of race or gender discrimination was not clearly erroneous and should be affirmed.

Framework for analyzing Batson and J.E.B. challenges
Batson held that a prospective juror's race "is unrelated to his fitness as a juror" and that the discriminatory use of peremptory challenges to exclude prospective jurors on account of race is prohibited by the equal protection clause. J.E.B. extended Batson's prohibition to gender, holding that "gender, like race, is an unconstitutional proxy for jury competence and impartiality." 511 U.S. at 129, 114 S.Ct. 1419.
Regardless of whether the challenge is based on race or gender, the same three-step, burden-shifting framework outlined in Batson is utilized.[8] In its simplest statement, the Batson analysis is as follows:
[O]nce the opponent of a peremptory challenge has made out a prima facie case of racial discrimination (step one), the burden of production shifts to the proponent of the strike to come forward with a race-neutral explanation (step two). If a race-neutral explanation is tendered, the trial court must then decide (step three) whether the opponent of the strike has proved purposeful discrimination.
Purkett v. Elem, 514 U.S. 765, 767, 115 S.Ct. 1769, 1770-71, 131 L.Ed.2d 834, 839 (1995). Basically, "[t]he challenging party acts at step one, the challenged attorney *544 acts at step two, and the judge acts at step three." Tracy M.Y. Choy, Note: Branding Neutral Explanations Pretextual under Batson v. Kentucky: An Examination of the Role of the Trial Judge in Jury Selection, 48 Hastings L.J. 577, 584 (1997). If the trial court determines that the challenging party, here the defendant, failed to establish the threshold requirement of a prima facie case (step one), the analysis is at an end; and the burden of production is never shifted to the challenged attorney, here the prosecutor, to articulate neutral reasons (step two).[9] Such is the case here; as discussed in detail later, the trial judge ended the analysis when he expressly determined that defendant failed to establish a prima facie case. Given that this case solely involves step onethe challenging party's establishment of a prima facie casewe further examine that first step.

The prima facie case requirement
Batson sets forth a combination of three factors that the challenging party, here the defendant, must establish to make a prima facie case. The first two factors are not disputed here. First, the prosecutor's peremptory challenges were directed at members of cognizable racial and gender groups. Second, the challenges were peremptory rather than for cause. State v. Givens, 99-3518 at p. 5 (La.1/17/01), 776 So.2d 443, 449. The third factor, which is the crux of the dispute, is that "the defendant must show circumstances sufficient to raise an inference that the prosecutor struck the venire person on account of being a member of that cognizable group." Id. Taken together, this three-prong showing by the defendant gives rise to "the necessary inference of purposeful discrimination" by the prosecutor. Batson, 476 U.S. at 96, 106 S.Ct. 1712 (emphasis added). Translated, the "necessary inference" language in Batson means that "[t]he inference is `necessary' because if such an inference cannot be drawn from the evidence presented by the defendant, he is unable to make a prima facie case of purposeful discrimination and his Batson challenge expires at the threshold." State v. Green, 94-0887 at p. 28 (La.5/22/95), 655 So.2d 272, 290 n. 24. Again, such is the case here.
Although the prima facie case requirement is not an onerous burden, it cannot be taken for granted. United States v. Bergodere, 40 F.3d 512, 516 (1st Cir.1994), cert. denied, 514 U.S. 1055, 115 S.Ct. 1439, 131 L.Ed.2d 318 (1995). A prima facie case will almost certainly be built on inferences "[b]ecause a peremptory challenge initially requires no explanation, [and therefore] no `smoking gun' will usually be present." United States v. Stavroulakis, 952 F.2d 686, 696 (2nd Cir.), cert. denied, 504 U.S. 926, 112 S.Ct. 1982, 118 L.Ed.2d 580 (1992). Whether defendant established sufficient circumstances to raise an inference of discriminatory use by the state of its peremptory challenges is the pivotal issue.
In determining whether the prima facie case requirement has been met, Batson instructs that "the trial court should consider all relevant circumstances. For example, a `pattern' of strikes against black jurors included in the particular venire might give rise to an inference of discrimination. Similarly, the prosecutor's questions and statements during voir dire examination and in exercising his challenges may support or refute an inference of discriminatory purpose." 476 U.S. at 96-97, *545 106 S.Ct. 1712 (emphasis added). Beyond citing those two illustrations of relevant circumstantial evidencea pattern and the voir direthe Batson court expressly declined to formulate any particular procedures or guidelines for determining purposeful discrimination. Instead, the Batson court expressed its confidence in the trial judge's ability to recognize a prima facie case, stating: "[w]e have confidence that trial judges, experienced in supervising voir dire, will be able to decide if the circumstances concerning the prosecutor's use of peremptory challenges creates a prima facie case of discrimination against black jurors." Batson, 476 U.S. at 97, 106 S.Ct. 1712. Batson thus left to the lower courts the task of determining the type and quantum of proof necessary for a defendant to establish a prima facie case. State v, Jacobs, 99-0991 at p. 4 (La.5/15/01), 803 So.2d 933, 938-39.
Tackling that task, in State v. Green, 94-0887, p. 24 (La.5/22/95), 655 So.2d 272, 288, we outlined a multi-factor approach for determining whether a prima facie case has been made; to wit:
The defendant may offer any facts relevant to the question of the prosecutor's discriminatory intent to satisfy this burden. Such facts include, but are not limited to, a pattern of strikes by a prosecutor against members of a suspect class, statements or actions of the prosecutor [during voir dire] which support an inference that the exercise of peremptory strikes was motivated by impermissible considerations, the composition of the venire and of the jury finally empaneled, and any other disparate impact upon the suspect class which is alleged to be the victim of purposeful discrimination. See State v. Collier, 553 So.2d 815 (La.1989); State v. Thompson, 516 So.2d 349 (La.1987), cert. denied, 488 U.S. 871, 109 S.Ct. 180, 102 L.Ed.2d 149 (1988).
More recently, we reiterated the lack of any bright line rules in this area:
No formula exists for determining whether the defense has established a prima facie case of purposeful racial discrimination. A trial judge may take into account not only whether a pattern of strikes against African-American venire-persons has emerged during voir dire but also whether "the prosecutor's questions and statements during voir dire examination and in exercising his challenges may support or refute an inference of discriminatory purpose." State v. Myers, 99-1803, p. 5 (La.4/11/00), 761 So.2d 498, 502 (quoting Batson, 476 U.S. at 97, 106 S.Ct. at 1723).
State v. Jacobs, 99-0991 at pp. 1-2 (La.7/16/01)(on reh'g), 803 So.2d 933, 958.
Turning to the instant case, to place the issue presented in context we begin by discussing the timing and global nature of defendant's objection.

Defendant's global objection
Near the end of a lengthy voir dire that spanned several days and twelve panels of prospective jurors,[10] defendant's attorney voiced a combined Batson-J.E.B. challenge, stating: "at this time we would like to raise a Batson objection on two grounds. One is that State's use of its peremptory exceptions was directly targeted to exclude people according to race." Following an interruption, defendant's attorney completed the objection, stating: "I said on two grounds. One is that they're using a peremptory challenge to exclude women and the other to exclude blacks." This was the full extent of the defense's *546 argument. Other than providing a list of the excluded jurors, no attempt was made to particularize the objection to any of the excluded jurors. Nor did the defense object contemporaneously with the prosecution's exercise of any of its previous peremptory challenges. Rather, the above global objection was the only objection in this case, and it was not made until after the examination of panel number ten (of twelve) prospective jurors.
By the time defendant's global objection was made, all but one of the jurors had been selected, and the state had exercised eight of its twelve available peremptory challenges. All eight of these challenges were exercised to exclude women; more particularly, five of the women were African-Americans, and three were Caucasian-Americans.[11] In response to defendant's global objection the following exchange took place:
By the Court: My problem with this is you guys wait until we've released these people and they're gone and then you put me on notice and obligates me to have someif you make some kind of showing and I've got to have a hearing, and the people are gone. If you're going to do this, you've got to put the Court on notice timely.
By Mr. Perkins: Well, I didn't understand there was to be any hearing as to the challenges themselves.
By the Court: Well, you're making these challenges for the record, but we can't have a hearing. If I have a hearing, how am I going to decide it if the people are already gone?
By Mr. Jones: Your Honor, they have to show a pattern of discrimination by exercise of the preempts of the State.
By the Court: But what I'm pointing out is
By Mr. Jones: And there is no pattern. So there is no hearing.
By the Court: But, Mr. Jones, if they did show a pattern, they have waited until these people have all been released and gone before they even notify me. If they showed a pattern what could I do?
By Mr. Jones: I understand your Court's ruling, but there is no pattern to it. There is absolutely no pattern. Every one that I excused has been for a valid reason.
The trial court's concern over the timing of defendant's objection was understandable; as we recently noted, "[t]he issue of the timeliness of Batson objections is difficult because a pattern of discrimination may not become evident in early stages of voir dire." State v, Jacobs, 99-0991 at p. 4 (La.5/15/01), 803 So.2d at 939. While counsel should preferably make the objection as soon as the discriminatory pattern is evident, "[c]ontemporaneous objections are not always feasible ... because a pattern of invidious discrimination may not be evident until jury selection is complete." Tursio v. United States, 634 A.2d 1205,1209-10 (D.C.App.1993).
Although Batson mandated that the challenging party make the objection timely, a Batson objection is timely if it is *547 made before the jury is empaneled and sworn. State v. Green, 94-0887 at p. 20 (La.5/22/95), 655 So.2d 272, 285; State v. Williams, 524 So.2d 746 (La.1988); see also La. C. Cr. Pro. art. 795 B(1)(mandating that "[p]eremptory challenges shall be exercised prior to the swearing of the jury panel.")[12] Defendant's global objection, albeit made near the end of the lengthy voir dire, was made before the jury was sworn and therefore was timely.

No pattern of discrimination
After a defendant lodges a timely Batson objection, the trial judge must decide whether the defendant has established a prima facie case. In this case, the trial court judge expressly found that defendant had established "absolutely" no pattern of discrimination, ruling orally that:
As it relates to the Batson challenge, as to the pattern of exclusion of blacks, absolutely denied. I have made copious notes on these things and I have indicated by the race of every black that takes the box and takes a seat and I have absolutely no pattern that has been established. I will make the same ruling as to the otherthe white women that you have mentioned, on the pattern being excluding these women. I find that my notes do not reflect any such a pattern.[13]
That express factual finding by the trial judge distinguishes this case from a pair of recent cases in which we remanded because of the trial court judges' failure to make such express factual findings, State v. Myers, 99-1803 (La.4/11/00), 761 So.2d 498, and State v. Givens, 99-3518 (La.1/17/01), 776 So.2d 443. In both of those cases, despite multiple objections by the defense and despite the exclusion of all but one of the cognizable group from the actual jury, the trial judge declined either to directly address whether the prosecutor's pattern of strikes established a prima facie case of discrimination or to indirectly find the lack of such pattern by requiring the prosecutor to articulate neutral reasons. Accordingly, we remanded in one case for an evidentiary hearing, Givens, supra, and in the other for a new trial, Myers, supra.[14] In both of those cases, we stressed the significance of the trial judge's deciding this issue and implicitly reaffirmed our prior holdings regarding the great deference due this fact-intense decision.
In Myers, supra, we stated: "[t]he trial judge observes first-hand the demeanor of the attorneys and venirepersons, the nuances of questions asked, the racial composition of the venire, and the general atmosphere of the voir dire that simply cannot be replicated from a cold record." 99-1803 at p. 6, 761 So.2d at 502. Further, we stressed that "[t]he trial judge's rulings and observations are integral to a review of a Batson challenge because of his or her *548 unique role in the dynamics of a voir dire." Id.
The trial court's express ruling that there was no pattern of racial or gender discrimination and thus no prima facie case places this case in an entirely different posture than those two cases, but in an identical posture with a more recent case in which, as here, we were squarely presented with a trial court's express factual ruling on this issue, Jacobs, supra.

Jacobs v. State is controlling
In Jacobs, the defendant raised his first Batson objection following the prosecutor's fourth peremptory strike of an African-American juror. By that time, however, the first three striken prospective jurors had already left the court house. The defendant nonetheless argued that he timely preserved his Batson objection and that he was therefore entitled to a remand for an evidentiary hearing on the prosecutor's reasons for challenging those three jurors. Rejecting that argument, the trial judge stated that he did not find a prima facie case supporting the objection and noted on the record that "he had been `satisfied on each of the [three] challenges that there was a racially neutral reason based upon the record and answers from the prospective jurors during voir dire examination.'" Jacobs, 99-0991 (on reh'g) at p. 1, 803 So.2d at 958.
Affirming, we held that "[w]hile this remedy, among others, may be available in an appropriate case, the record of voir dire in the present case reveals that the prosecutor's use of peremptory strikes was so clearly justified that our consideration of a remand to determine the existence of discriminatory intent is not warranted." Jacobs, 99-0991 at p. 3, 803 So.2d at 939.
In denying rehearing in Jacobs, supra, we reiterated the soundness of our decision regarding the trial court's treatment of the defendant's challenge to the first three striken jurors, stating:
In the present case, the trial judge found on the basis of his personal observation of voir dire examination that the answers of the prospective jurors, and not discriminatory intent, explained the prosecutor's exercise of his first three peremptory challenges to exclude African-Americans from the jury. In our opinion on original hearing, we essentially found no abuse of the trial court's discretion because the attitudes expressed by the jurors towards capital punishment and their relationships with family members who were incarcerated made them entirely predictable targets of state peremptory challenges for specific, objective, and trial-related reasons other than race.
State v. Jacobs, 99-0991 (La.7/16/01)(on reh'g) at p. 2, 803 So.2d at 958-59. Moreover, we stressed the deference due this fact-intense decision, stating "Batson accords a trial court considerable flexibility and broad discretion in this regard." Id.
While the instant case involves twice as many challenges as in Jacobs, we find the same analysis applies. Applying that same analysis, we separately address in reverse order defendant's Batson and J.E.B. challenge, in particular, and defendant's reliance on bare statistics, in general.

Bare statistics
Defendant argues that the trial court erred in failing to find he established a prima facie case based on bare statistics alone. Racial discrimination, defendant contends, can be inferred from the record, which reflects that when he lodged his objection, the state had accepted twenty-two of twenty-five Caucasian-Americans prospective jurors tendered to it (88%), yet *549 only one of six African-Americans (16%), and had exercised five of its eight peremptory challenges to strike African-American women (over 62%) Gender discrimination, defendant contends, likewise can be inferred from the record, which reflects that when he lodged his objection, the state had accepted fourteen of the fourteen males tendered to it (100%), yet only nine of the seventeen females (53%), and had exercised eight of its eight peremptory challenges to strike female prospective jurors (100%).
Based on the application of "Hyper-Geometric Distribution," defendant contends that the statistical improbability that the state would exclude such a high percentage of African-Americans and females relative to their representation in the jury pool establishes the trial court erred in failing to find the prima facie requirement was met.[15] Defendant adds that simply because the prosecutor left one African-American male on the jury despite the prosecution having four challenges left is insufficient to preclude a finding of prima facie case.[16]
Although we agree with defendant that the mere presence of some African-Americans on the jury is no bar to finding a prima facie case, we also recognize, as the state contends, that it is appropriate to consider the fact that the state did not eliminate all African-Americans when deciding whether or not there exists a prima facie case of discrimination. 5 Wayne R. LaFave, et al, Criminal Procedure § 22.3(d)(2nd ed. 1999)(collecting cases including State v. Collier, 553 So.2d 815 (La. 1989), for the former proposition, and State v. Thompson, 516 So.2d 349, 354 (La.1987), for the latter).[17]
Neither the total exclusion of a cognizable group from the jury nor the mere presence of one or two perhaps token members of the group on the jury is dispositive of whether the prima facie requirement is satisfied. "The mere inclusion of some blacks on the jury is no bar to a finding of a prima facie case, and there is not a per se rule that a certain number or percentage of the challenged jurors must be black in order for the court to conclude *550 a prima facie case has been made out." LaFave, supra (collecting cases). Such number games, stemming from the reference in Batson to a "pattern" of strikes, are inconsistent with the inherently factintense nature of determining whether the prima facie requirement has been satisfied. Indeed, such attempts to fashion absolute, per se rules are inconsistent with Batson in which the court instructed trial courts to consider "all relevant circumstances." 476 U.S. at 96-97, 106 S.Ct. 1712. Consequently, "it is important that the defendant come forward with facts, not just numbers alone, when asking the district court to find a prima facie case." United States v. Moore, 895 F.2d 484, 485 (8th Cir.1990).
Applying these principles to this case, we hold that defendant's reliance on bare statistics to support a prima facie case of both gender and race discrimination is misplaced. For completeness' sake, we separately address each of defendant's challenges.

J.E.B. challenge
Viewed in a vacuum the state's use of eight of eight peremptory challenges to exclude female prospective jurors could be viewed as giving rise to a pattern of gender discrimination sufficient to establish defendant's prima facie burden; however, the record supports the trial court's contrary conclusion.
First, and foremost, defendant's claim that a pattern of gender discrimination was established is undercut by the final composition of the juryfive females and seven males. This case falls short of the pattern of wholesale exclusions demonstrated by the selection process in Myers, supra, and Givens, supra, discussed above, in which we found a prima facie case established and remanded for additional consideration of the Batson challenge.
Second, defendant does not cite, nor do we discern, from the prosecutor's statements, questions, or comments during the lengthy voir dire in this case any inference of gender-based exercise of peremptory challenges.
Third, given this case includes a charge of rape, the normal scenario would be for the prosecutor to attempt to use his peremptory challenges to strike male jurors. See Givens, supra. That defendant alleges the prosecutor is discriminating by using his challenges to strike female jurors is inconsistent with that normal stereotypical conduct J.E.B. is aimed at preventing. This would appear to dictate that defendant offer some additional support for this claim, yet, as noted, he failed to offer anything other than bare statistics.
Given the trial court's discretion in making this determination, the number of female jurors ultimately seated on the jury, and defendant's failure to make any argument other than citing bare statistics, we conclude that the trial court's decision that defendant failed to establish a prima facie case of gender discrimination was not an abuse of discretion.

Batson challenge
Defendant's argument regarding racial discrimination presents a closer call when viewed from a numbers perspective. As in Myers and Givens, the ultimate jury that tried defendant included only one African-American. However, as stressed above, this case is distinguishable from Myers and Givens, in that the trial judge made an express factual determination that there was "absolutely" no pattern of racial discrimination. For the following reasons, we find this decision supported by the record.
As with gender, defendant does not cite, nor do we discern, from the prosecutor's statements, questions, or comments during the lengthy voir dire in this case *551 any inference of race-based exercise of peremptory challenges.
While a pattern of racial strikes is arguably present given the state used five of its eight peremptory challenges to strike African-American potential jurors, a pattern of strikes is only one of the multiple factors that may be considered in making this fact-intense determination. Indeed, while Batson cites a "pattern of strikes" as an example of the type of evidence that can give rise to an inference of discrimination, another equally significant example Batson cites is the voir dire. See Bergodere, 40 F.3d at 517 (citing voir dire colloquy between prospective juror and attorneys which reflected "a legitimate, nondiscriminatory reason why conscientious counsel might desire to exclude the juror from further service").
We rejected a similar attempt to rely on bare statistics on direct appeal to establish the trial court's abuse of discretion in failing to find a prima facie case of race discrimination in Jacobs, the case we find controlling here. In Jacobs, we found the voir dire of the first three excluded prospective jurors revealed those three jurors were "predictable targets" for state peremptory challenges, precluded an inference of discrimination, and supported the trial court's finding that the prima facie case requirement was not met. See also La. C. Cr. Pro. art. 795C(codifying Batson and expressly sanctions courts to look to the voir dire examination of the prospective jurors as one factor in making the initial prima facie case determination).[18]
As in Jacobs, we find the voir dire of the five African-Americans who were stricken by the state shows that each of them were "predictable targets" for specific, objective, and trial-related reasons other than race. Particularly, we briefly outline the relevant voir dire responses of each of these five prospective jurors.
First, Bessie Colvin stated that she had prior experience as juror in a civil case several years ago. Another factor the prosecutor seemed disturbed about was that Ms. Colvin gave "one word answers." On the latter point, the following exchange took place between Ms. Colvin and the prosecutor:
"Q: If you were selected to serve on this Jury what would you feel your duties would be?
By Ms. Colvin: Fair
Q: Okay. Another one of those one word answers.
By Ms. Colvin: "Well, I don't talk that much so."
Arguably, this juror's "one word answers" fall into the category of peremptory challenges based on juror appearance, attitude and demeanor, which category includes "speech patterns" and thus negates any race-based reason for the state's challenge. David C. Baldus, et al, Symposium: Race, Crime, and the Constitution: Article: The Use of Peremptory Challenges in Capital Murder Trials: A Legal and Empirical Analysis, 3 U. Pa. J. Const. L. 3, 14 n. 21 (2001).
Second, Layota Reed's voir dire responses indicated that she attended the *552 same Baptist church as the defendant's attorney, that she had a twenty-three month old daughter (which is the same age as the victim), and that she was very weak on the death penalty. Taken alone, Ms. Reed's reservations about the death penalty constitute "direct evidence of potential bias that is otherwise insufficient to support a challenge for cause." Baldus, supra. Moreover, Ms. Reed stated that she should not sit on this jury because she did not think it would be fair to the defendant.
Third, Wanda Oatis indicated that as a prison minister's wife she had regular contact with prisoners; she often assisted her husband in ministering to people that are in jails, including Ouachita Parish jails and Angola, but not to death row prisoners. As a fifth grade school teacher, she expressed a work-related hardship in that her students had just started the LEAP tests and she would be concerned about a substitute administering the tests to them.
Fourth, Charlotte McNeal, a registered nurse, stated that she would take a clinical view in reviewing the pictorial evidence in this case; specifically, she stated that "[she] would look at a picture and instantly become clinical." Given the significance of the pictures in this case, especially those pertaining to the bite-mark issue, this was a legitimate, case-related reason why conscientious counsel might desire to exclude her from further service.
Finally, Bernadine Staten was the only juror that the prosecutor offered a contemporaneous, express reasons for striking. To avoid an apparently impending dispute over a cause challenge based on her child care concerns, the prosecutor used a peremptory challenge and stated that he "wanted the record to reflect the only reason I'm doing that is because of the hardship to her family that she can't overcome. And there is no other reason."
As detailed above, the voir dire responses of each of these five prospective African-American jurors made them clear choices for peremptory challenges by the state. Thus, our review of the voir dire reinforces our finding that the trial court did not abuse its discretion in finding that defendant failed to establish a prima facie case of discrimination.
Another factor supporting our conclusion is the shared race of defendant and the victim, both Caucasian-Americans. While Batson is not limited to interracial cases, a commentator observed that "[s]ome lower courts take the view that `the race of a defendant as well as the race of the victim and key witnesses, is a relevant circumstance that the trial court may consider when determining whether defendant has raised an inference of purposeful discrimination sufficient to make a prima facie case.'" 5 Wayne R. LaFave, et al, Criminal Procedure § 22.3(d)(2nd ed. 2000 Supp.)(citing State v. Locklear, 349 N.C. 118, 505 S.E.2d 277 (1998)).
A final factor that supports our decision is that, as the state contends, the actual jury that tried this case had one African-American juror even though the state had unused peremptory challenges. That fact combined with the fact that this is a capital case requiring a unanimous verdict has been recognized by this court on at least two prior occasions as a valid factor to consider. State v. Taylor, 99-1311 at p. 6 (La.1/17/01), 781 So.2d 1205, 1212-13 (noting that one African-American was on the actual jury and that the state had not exhausted all of its peremptory challenges); State v. Tart, 93-0772 p. 18 (La.2/9/96), 672 So.2d 116, 141 (acknowledging that mere presence of African-American jurors does not defeat a Batson *553 claim, yet capital case unanimity requirement may be considered).
In sum, given the deference due the trial court's determination, defendant's failure to make any argument other than citing bare statistics, the requirement of a unanimous verdict, the voir dire responses, and the shared race of defendant and the victim, we conclude that the trial court's decision that defendant failed to establish a prima facie case of racial discrimination was not an abuse of discretion.

(2)Exclusion of demonstrative bite mark evidence
The second issue we address is defendant's argument that the trial judge erred in prohibiting defendant from showing the jury photographs depicting "actual" bite marks. The "actual" bite mark pictures, depicting bite marks made by unknown biters on the bodies of various unknown victims, were part of a booklet prepared by defendant's expert. The booklet also included several pages of written materials explaining the characteristics of bite marks and several pictures of the victim in this case. Thus this issue has two levels. On one level, the issue is whether the trial judge erred in ruling the booklet itself could not be used as demonstrative evidence. On the other level, the issue is whether the judge erred in ruling the "actual" bite marks pictures could not be used. Defendant's argument vacillates back and forth between these two levels.
At trial, the issue of whether certain wounds on the victim's body were bite marks was hotly contested. As part of its case-in-chief, the state called Dr. Reisner, a forensic odontologist, who testified that several marks on the victim's body were bite marks that with varying degrees of certainty matched defendant's dentition. In response, the defense called two of its own bite mark experts: Dr. Kirschner, a forensic pathologist, and Dr. Souviron, a forensic odontologist. Both defense experts testified that these marks on the victim's body were not bite marks.[19]
During Dr. Souviron's direct examination, the defense sought to distribute to the jury the booklet that Dr. Souviron had prepared to "educate" them about what genuine bite marks look like. Dr. Souviron summarized his booklet's contents as follows:
"Generally the material is what I was given in 1996, on this case and it contains reprints from the odontology information on bite mark evaluation, terminology and standards for bite marks. It also has a section in there that has a series of bite marks of cases that I have done to show Juries what a real bite mark looks like and then a little demonstrative part in there to show them when we talk about how we identify people and what bite marks look like and how we can identify people by the class and individual characteristics."[20]
*554 In sustaining the prosecutor's objection to the defense's use of the booklet, the trial judge ruled that Dr. Souviron's testimony "need[ed] to be restricted to evidence that has been presented in this case" and stated:
"[I]f it involves information that's offered into evidence, photographs, the medical reports or what have you concerning the victim he is allowed to use that. You'll just have to take those others out.... I'm just not going to let the Jury sit with a book. Any expertmost experts have written books and things and it's just not proper for an expert to say I wrote such and such a book now here Jury, you follow this while I talk about it. I just don't accept it. But if you're going to offer the book you need to take those other photographs out."
Defendant argues that this ruling deprived him of the right to present a defense. The state counters that the trial judge did not preclude the defendant from presenting a defense; rather, the trial judge allowed Dr. Souviron to testify fully as to why he opined the marks on the victim's body were not bite marks.
We readily reject defendant's argument insofar as it is directed at the trial judge's refusal to allow him to use the booklet. The trial judge clearly was entitled to prohibit the defense's expert from turning his courtroom into a classroom. The issue is thus narrowed to whether the trial judge's refusal to allow defendant to use the photographs of bite marks on others (not the victim) was error.
Focusing on the individual photographs at issue, defendant cites two theories in support of his argument that the trial judge's decision precluding him from using these photographs was an abuse of discretion; to wit: (i) these photographs were demonstrative evidence, and (ii) these photographs were relevant circumstantial evidence. We address these in reverse order.

Photographs as circumstantial evidence
The general rule in Louisiana, and elsewhere, regarding the introduction of photographic evidence is based on an analogy to visual aids. Indeed, one author notes that visual aids rode the coattails of photographs into the courtroom. Jennifer L. Mnookin, The Image of Truth: Photographic Evidence and the Power of Analogy, 10 Yale J.L. & Human. 1, 64 (1998)(noting the inherently persuasive force of photographs and that "[t]he sheer force of doctrine alone could not keep the photograph secure in a box labeled `illustration.'") This analogy has formed the basis for introducing "the general run of photographs." 2 John W. Strong, McCormick on Evidence § 214 (5th ed. 1999).[21]
Photographs directly displaying material facts connected to the case are routinely introduced based on this analogy. Illustrative are the cases, such as this one, in which gruesome autopsy pictures of the victim are allowed to be introduced. See George W. Pugh, Louisiana Evidence Law, 66-75(1974)(discussing liberal introduction of gruesome photographs of victim). Such photographs are allowed despite their obvious ability to inflame the jury based on the "eminently satisfactory character" of such direct evidence. McCormick, supra at § 212.
*555 In contrast, demonstrative evidence, including photographs, "may also be offered for its circumstantial value, i.e., as the basis or an inference beyond those facts which are perceivable." Id. In disallowing the photographs of bite marks on others (not the victim), the trial judge reasoned that it was the circumstantial use of such photographs that he found objectionable, stating: "[i]f you're going to use a picture now, look here's a bite mark made on so and so over her [sic] just look at the difference? Now, how is that fair?" The implication, the judge stated, is "that all bite marks have got to be like this. Now, the picture of Haley Oliveaux doesn't look like that so that's not a bite mark." Still further, the judge reasoned that while Dr. Souviron could voice his opinion that there were no bite marks based on photographs of the victim "I don't want him to show a picture of somebody else that's bitten almost all the way through or more pronounced bite and say now here's a bite mark, that's not a bite mark."
The trial judge's decision to disallow the defense to use these photographs was thus based, at least in part, on the potential for such photographs to be used as circumstantial evidence. "When circumstantial evidence is involved, in the present context [of demonstrative pictorial evidence] as elsewhere, the trial judge will generally be viewed as possessing a broader discretionary power to weigh the probative value of the evidence against whatever prejudice, confusion, surprise and waste of time are entailed, and to determine admissibility accordingly." McCormick, supra at § 212. We conclude that, at the very least, confusion and prejudicial effect outweighs any probative value these photographs may have had as circumstantial evidence in rebuttal to the state's bite mark evidence. We therefore find no merit to defendant's argument that the trial judge's decision disallowing these photographs from being used as circumstantial evidence was an abuse of discretion.

Photographs as demonstrative evidence
Defendant's alternative theory is that these photographs were proper demonstrative evidence, akin to maps and models, that he was entitled to use as a visual aid to assist the jury in understanding Dr. Souviron's theory. In Dr. Souviron's own words, the illustrative reason for showing the jury these photographs was as follows:
"This is an unusual situation in that the defense in this case has to be able to have a Jury understand what a bite mark looks like in the first place in order to be able to intelligently evaluate what isn't a bite mark, what bite marks look like, the class characteristics, would help them and I will be asking them toand I did it verbally and I'd like to it visually to show the Jury what patterns are left by teeth so you can use that to actually look at the pattern injury based on the individual characteristics and describe what the person looks like and that's a hard concept for a lay person to understand that you can describe the person by a bite and I want to be able to show the Jury that I can describe what this...".
The state counters that the trial judge viewed the photographs of other bite marks and determined under La. C.E. art. 401 that these photographs were not relevant evidence.[22] In determining the admissibility of demonstrative evidence over *556 such an objection, the proper standard is "whether the proffered evidence is relevant to any material issue in dispute and, if so, whether its probative value exceeds its probable prejudicial effect." State v. Prestridge 399 So.2d 564, 573 (La.1981)(citing State v. Hawthorne, 345 So.2d 1170 (La. 1977)); see La. C.E. Art. 403 (providing that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of confusion of the issues, or misleading the jury...").
Agreeing with the state and voicing his skepticism regarding the use of these photographs, the trial judge stated that "what [Dr. Souviron] will testify to apparently is the bite mark on some other individual made by some other teeth not the molding of the Defendant that we have here." The judge also voiced concerns about the potentially misleading effect these photographs could have on the jury given the inference, discussed above, that "all bite marks have got to be like this. Now, the picture of Haley Oliveaux doesn't look like that so that's not a bite mark."[23] Given this potential for confusion coupled with the arguable lack of relevance, we again find the trial judge did not abuse his discretion in excluding these pictures as demonstrative evidence.
Our conclusion is bolstered by considering the type of demonstration that the defense intended to use with these photographs; the defense intended to demonstrate that the wounds on the victim were not bite marks by comparing them to these photographs of other bite marks.[24] When such demonstrations are brought into the courtroom on film, "the fact of filming does not alter the basic principles applicable to experiments and demonstrations." McCormick, supra at § 214. Such demonstrations can be divided into two types: replications of an original event, on the one hand; and true illustrations, on the other. Id. While visual aids falling within the latter category are routinely allowed to be used at trial, the photographs at issue in this case fall within the former category of a replication of an original (actual) eventactual bite marks on a victim's bodyand thus are admissible only if a similarity requirement is satisfied. That is, the replication must be conducted under substantially similar circumstances. Id.
That the trial judge so viewed these photographs is evidenced by the following query he posed at trial:
How would you distinguish this from say if we were dealing with an automobile accident case and there was a bumper involved and the car that was involved that had all kinds of damage on it are you saying that you could put another bumper in there that's just like it that was not involved in the wreck and you view it as evidence?
The defense's response was that "the only way we can show what bite marks look like if we don't have bite marks in this case are *557 by showing the bite marks of other individuals.[25] And that's demonstrative evidence." Disagreeing, the trial judge responded that "you can't show something else if it's not made by the same teeth and by the same individual. It's something that's not been offered into evidence I just do not see how you do it." The trial judge thus, albeit implicitly, imposed the similarity requirement and found these photographs, depicting unknown victims who were bitten by unknown individuals, did not depict bite marks made under "substantially similar circumstances." We find no error in the trial court's reasoning.
Finally, we note that the testimony of Dr. Souviron and Dr. Kirschner clearly contradicted and rebutted that of Dr. Reisner, the state's expert. Defendant was not deprived of putting on a defense relative to the bite mark issue. The jury was certainly presented with conflicting opinions and was free to believe either. Accordingly, we hold that the trial judge did not abuse his discretion in precluding the defense from using these photographs as evidence.

CAPITAL SENTENCE REVIEW
Under La.Code Crim. Pro. art. 905.9 and La. S.Ct. Rule 28, this Court reviews every sentence of death imposed by the courts of this state to determine if it is constitutionally excessive. In making this determination, this Court considers whether the jury imposed the sentence under the influence of passion, prejudice or other arbitrary factors; whether the evidence supports the jury's findings with respect to a statutory aggravating circumstance; and whether the sentence is disproportionate, considering both the offense and the offender. In the instant case, the trial court has submitted a Uniform Capital Sentence Report ("UCSR") and the Department of Public Safety and Corrections ("DOC") has submitted a Capital Sentence Investigation ("CSI"). The state and defendant have submitted Capital Sentence Review Memoranda.
The above submissions indicate that defendant is a Caucasian American male who was twenty-five years old at the time of the offense. The defendant was born in New Orleans to Barbara Poole. Soon afterwards, Bennie Duncan adopted him. He spent a large part of his childhood with his paternal grandparents, Elsie and Claude Duncan.
As for his educational and employment background, defendant quit school after the tenth grade; however, he later earned a GED. The record reflects that defendant was employed at the time of the offense. As for his criminal record, defendant has no prior juvenile or adult felony convictions; a misdemeanor record that includes simple battery and theft convictions; and, significantly, no criminal record suggesting any prior involvement in sex-related offenses.
Defendant acknowledges a practice of smoking at least three marijuana cigarettes a day, a practice he started when he *558 was fifteen years old.[26] Defendant also acknowledges previous drug use of cocaine, ecstasy and crystal methamphetamine. Although defendant has never been married, he has at least one child from a prior relationship,[27] and claims to have at least four other children from different relationships who live elsewhere.
The CSI includes information regarding the details of the offense that were not brought out at trial. In preparing the CSI, the probation officer interviewed a former babysitter of the victim, Debbie Craighead. Ms. Craighead stated that she had contacted Child Protective Services on several occasions regarding her suspicion that defendant was abusing the victim. Ms. Craighead further stated that she had taken several photographs of the victim's injuries to protect herself from liability, but she claimed a defense investigator took these pictures from her. Still further, she claimed that she had found blood in the victim's diaper and that the victim would cower whenever defendant would try to retrieve her. Ms. Craighead also claimed that Allison Oliveaux had been advised of the suspected abuse on numerous occasions, but failed to intervene. In fact, Ms. Craighead found Allison Oliveaux as culpable as defendant for her daughter's death.
While nothing suggests that Allison Oliveaux played any role in the perpetration of the actual offense, her lack of concern despite apparent knowledge of the abuse could arguably have convinced jurors to spare defendant the death penalty based on their knowledge that she had not been charged with any crime. Defense counsel apparently was aware of this information and decided for strategical reasons not to introduce such evidence implicating defendant in previous incidents of abuse in order to argue about Allison Oliveaux's relative culpability.

Passion, prejudice, and other arbitrary factors
Defendant claims "that a plethora of arbitrary factors were interjected into his capital trial." One of those factors was the alleged systematic exclusion of African-Americans and women from the jury. This Batson-J.E.B. challenge was addressed and rejected above. The other factors defendant alleges are addressed in the appendix and found to lack merit. No other prejudice is perceived.

Aggravating circumstances
At the penalty phase of the trial, the jury returned the following three aggravating circumstances: (1) that the victim was under the age of twelve, (2) that the killing occurred during the perpetration or attempted perpetration of an aggravated rape, and (3) that the killing was done in an especially heinous, atrocious, and cruel manner. La.Code Crim. Pro. art. 905.4(A)(1), (7), and (10); Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The record amply supported these three aggravating factors returned by the jury.

Proportionality
Although the federal Constitution does not require proportionality review, Pulley v. Harris, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984), comparative proportionality review remains a relevant consideration in determining the issue of excessiveness in Louisiana. State v. Burrell, 561 So.2d 692, 710 (La.1990); State v. *559 Wille, 559 So.2d 1321 (La.1990); State v. Thompson, 516 So.2d 349 (La.1987).
This Court reviews death sentences to determine whether the sentence is disproportionate to the penalty imposed in other cases, considering both the offense and the offender. If the jury's recommendation of death is inconsistent with sentences imposed in similar cases in the same jurisdiction, an inference of arbitrariness arises. State v. Sonnier, 380 So.2d 1, 9 (La.1979)
This Court, however, has set aside only one death penalty as disproportionately excessive under the post 1976 statutes, finding in that case a sufficiently "large number of persuasive mitigating factors." Sonnier, supra; see also State v. Weiland, 505 So.2d 702, 707-10 (La.1987) (reversing on other grounds and suggesting in dicta that death penalty disproportionate).
Jurors in the Fourth Judicial District, composed of Ouachita and Morehouse Parishes, have recommended imposition of the death penalty on five occasions (one of which was tried in the Fourth Judicial District on a change of venue).[28] One case, State v. Prejean, 379 So.2d 240 (La. 1979), involved the murder of an on-duty state trooper. The second case, State v. Baldwin, 388 So.2d 664 (La.1980), involved the robbery and beating death of an eighty-five year old woman. The third case, State v. Tart, 93-0772 (La.2/9/96), 672 So.2d 116, involved the residential burglary and murder of a seventy year old man and his sixty-six year old wife. The fourth case, State v. Divers, 94-0756 (La.9/5/96), 681 So.2d 320, involved the kidnaping and murder of two men during the commission of an armed robbery.[29]
A review of these other capital verdicts from the Fourth Judicial District does not suggest that defendant received a disproportionately harsh sentence although none of the underlying crimes bears any resemblance to the instant case.
Given the scarcity of comparable cases in Ouachita Parish, we find it appropriate to look beyond the judicial district in which the sentence was imposed and to conduct the proportionality review on a state-wide basis. State v. Brogdon, 457 So.2d 616, 632 (La.1984) (noting court free to "refer to similar cases or comparable cases elsewhere" in performing proportionality review). Our jurisprudence includes a line of cases affirming capital sentences based primarily on the jury's finding that the defendant killed during the perpetration or attempted perpetration of an aggravated rape.[30] In this case, the *560 evidence of rape, combined with the victim's age (less than two years old), strongly supports a decision that death is not a disproportionate penalty. Cf. State v. Lavalais, 95-0320, p. 19 (La.11/25/96), 685 So.2d 1048, 1059 (although juries in Louisiana have historically favored life to death for contract killings, death is not a disproportionate penalty for the offense).

Decree
For the reasons assigned herein, the defendant's conviction and death sentence are affirmed. In the event this judgment becomes final on direct review when either: (1) the defendant fails to petition timely the United States Supreme Court for certiorari; or (2) that Court denies his petition for certiorari; and either (a) the defendant, having filed for and been denied certiorari, fails to petition the United States Supreme Court timely, under its prevailing rules, for rehearing of denial of certiorari; or (b) that court denies his petition for rehearing, the trial judge shall, upon receiving notice from this Court under La.Code Crim. Proc. art. 923 of finality of direct appeal, and before signing the warrant of execution, as provided by La. Rev.Stat. 15:567(B), immediately notify the Louisiana Indigent Defense Assistance Board and provide the Board with reasonable time in which: (1) to enroll counsel to represent the defendant in any state post-conviction proceedings, if appropriate, pursuant to its authority under La.Rev. Stat. 15:149.1; and (2) to litigate expeditiously the claims raised in that original application, if filed in the state courts.
AFFIRMED.
NOTES
[*] Retired Judge Robert L. Lobrano, assigned as Justice Pro Tempore, participating in the decision.
[1] Assignments of error not treated in this opinion are addressed in an unpublished appendix to this opinion.
[2] The jury was allowed to listen to the audio version as well as to read a transcribed version.
[3] More precisely, the autopsy report listed seven acute traumatic injuries: (1) contusion of the frenulum; (2) lacerations of the rectum and anus; (3) multiple contusions and abrasions, acute, of the head and neck; (4) multiple contusions and abrasions, acute, of the right and left upper and lower extremities; (5) acute contusion of the abdomen; (6) acute hemorrhage of the base of the tongue; and (7) acute hemorrhage of the right and left strap muscles (sternocleidomastoid muscles).
[4] Dr. Norwood also testified for the state, claiming that when the victim arrived at the hospital, her body was cold. He also corroborated Dr. Hayne's testimony about the child's anus having been washed before she was brought to the hospital but was unable to give any specifics about the time of death.
[5] The challenging party need not share the excluded juror's race (and by extension gender) to exercise a Batson challenge. Powers v. Ohio, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991)(eliminating the former Batson requirement that the defendant share the excluded juror's race). Powers, supra, thus extended to defendant, a Caucasian-American male, third party standing to assert the equal protection rights of the excluded African-American prospective jurors (and by extension the female jurors).
[6] Defendant also cites three times when the prosecutor refers to the Caucasian-American victim as a blue eyed, blond hair baby girl. All three references cited, however, are from the trial on the meritsopening and closing argument on the guilt phase and closing argument on the penalty phase. Defendant's reliance on these non-voir dire statements is thus entirely misplaced.
[7] Defendant requests that we take judicial notice of the trial judge's unavailability to preside over a Batson hearing on remand given his taking disability retirement.
[8] For ease of reference, we thus refer simply to Batson.
[9] For purposes of making a more complete record, some courts have nonetheless ordered the prosecutor to give race neutral reasons. State v. Rose, 606 So.2d 845 (La.App. 2d Cir.1992)(citing State v. Collier, 553 So.2d 815, 819 n. 5 (La.1989)).
[10] In this case, the jury selection process was lengthy due, in part, to the publicity problem.
[11] The state had exercised five peremptory challenges to exclude African-American women Bessie Colvin (Panel 7), Latoya Reed (Panel 1), Charlotte McNeal (Panel 8), Bernadine Staten (Panel 3) and Wanda Otis (Panel 10)and three to exclude Caucasian-American womenSherry Bell (Panel 7), Betty Peterson (Panel 4) and Sharon Long (Panel 8). Ultimately, the jury panel was composed of five Caucasian-American females, six Caucasian-American males, and one African-American male. The two alternates were one Caucasian-American male and one African-American male.
[12] This deadline is tied to the available remedies in the event a Batson violation is found; until the jury is empaneled and sworn, the trial judge readily can correct any constitutional deficiency that crept into the jury selection process. State v. Green, 94-0887 (La.5/22/95), 655 So.2d 272.
[13] The trial court thus never reached the second stage of requesting the prosecutor to give race- and gender-neutral reasons. Nonetheless, the prosecutor denied any pattern of discrimination and interjected that "[e]very one that I excused has been for a valid reason."
[14] Because the death of the trial judge rendered moot any possibility of reconstructing the voir dire and determining whether the defense had in fact established a prima facie case of discrimination, this court reversed the defendant's conviction and sentence and remanded for retrial. Myers, 99-1803 at pp. 6-7,761 So.2d at 502-03.
[15] Hyper-geometric distribution is a known mathematics term and refers to a random selection (made without repetition) among objects of two distinct types. So-called binomial distributions have long been associated with jury discrimination issues. See Castaneda v. Partida, 430 U.S. 482, 496, n. 17, 97 S.Ct. 1272, 1281, 51 L.Ed.2d 498 (1977); see also Michael O. Finkelstein, The Application of Statistical Decision Theory to the Jury Discrimination Cases, 80 Harv.L.Rev. 338, 353-356 (1966) (discussing jury venire selection between Caucasian and African-Americans as a series of Bernoulli trials in which, as in a series of coin flips, there are only two choices, the result of each selection is independent of the other selection, and the probability of selecting one race or another remain constant throughout the selection process). In Givens, supra, we noted that the defendant had attempted in the trial court to utilize this method to statistically prove his claim, but given our decision to remand did not address the weight, if any, to give such statistics. See Stephen R. DiPrima, Note: Selecting a Jury in Federal Criminal Trials After Batson and McCollum, 95 Colum. L.Rev. 888, 921 (1995)(noting that "[n]o federal court, however, has applied statistical decision theory to a Batson ... claim.")
[16] Defendant contends that the state cannot rely on the fact it accepted one African-American on the jury because that juror, Joe Bass, repeatedly expressed his pro-death penalty position. While defendant contends that he made a cause challenge to that juror, defendant concedes that the record contains no indication of such challenge having been made.
[17] As discussed later, the latter proposition is especially appropriate when, as in this case, a unanimous verdict is required, and the prosecutor has unused peremptory challenges.
[18] La. C. Cr. Pro. art. 795 C provides:

No peremptory challenge made by the state or the defendant shall be based solely upon the race of the juror. If an objection is made that the state or defense has excluded a juror solely on the basis of race and a prima facie case supporting that objection is made by the objecting party, the court may demand a satisfactory racially neutral reason for the exercise of the challenge, unless the court is satisfied that such reason is apparent from the voir dire examination of the juror.... (Emphasis supplied.)
[19] As noted, Dr. Souviron's testimony that none of the markings on the victim's body were bite marks was premised, at least in part, on the fact that all of these marks were single-archs, i.e., lacked corresponding teeth prints, and his opinion that such single-arch bite marks are rare. Cf. Brewer v. State, 725 So.2d 106, 116-117 (Miss.1998), cert. denied, 526 U.S. 1027, 119 S.Ct. 1270, 143 L.Ed.2d 365 (1999)(similar divergent testimony by same odontologists in case involving murder and sexual battery of three year old by mother's boyfriend).
[20] A review of the booklet reveals that it contains twenty-three pages, the first ten of which discuss bite mark analysis generally, and contains five photographs of bite marks from other, unrelated cases. The remaining pages contain various photographs of the victim.
[21] A basic distinction has been recognized between the visual aids category, which includes such things as models, maps, sketches and diagrams, and photographic evidence. Items falling within the former category, by nature, generally are not "confusable with real evidence." McCormick, supra at § 213. The same is not true of photographs. McCormick, supra at § 212 (noting photographs "can easily figure in the history of a case and thus constitute real evidence.")
[22] La. C.E. art. 401 defines "relevant evidence" to mean "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable than it would be without the evidence."
[23] During its proffer, the defense examined Dr. Souviron outside the jury's presence. Dr. Souviron analogized this to an injury to the jaw, stating that in such cases, he typically demonstrated how the jaw works with a model. The trial court judge interjected that "all bite marks are not going to look the same." Over the prosecutor's objection, Dr. Souviron disagreed, explaining that some bite marks do look the same in that "[a]ll bite marks have certain things in common, class characteristics, that is upper and lower teeth. Upper half circles, lower half circle opposing each other they all look the same in that regard. Now, when it comes to the individual characteristics of the teeth that's what separates a(sic) different individuals."
[24] Again, this is the circumstantial nature of the photographs the trial court judge stressed.
[25] Even the defense's own expert acknowledged that better ways to demonstrate this point to the jurors of what actual bite marks look like were available. Dr. Souviron testified that a more effective way to illustrate this point to the jury would have been to tell the jurors to bite themselves. Another suggestion, which is even more apt, was that the defense could have taken the mold of defendant's dentition and used it to bite things, like an apple, or people. The latter experiment would have produced samples of what defendant's bite mark looks like and thus would have been related to this case. Indeed, the issue would be entirely different if the pictures depicted bite marks made by the molds of defendant's teeth that are in the record. Instead, these photographs depict bite marks entirely divorced from the instant case.
[26] Defendant claimed that he smoked marijuana and drank alcohol the night before the offense, but this was not urged as a defense at trial.
[27] In Allison Oliveaux's statement to the police, she indicated that defendant was distraught on the night before the offense because his ex-girlfriend planned to move to California with his child.
[28] During the period of January 1, 1976 to January 1, 1985, the District Attorney of the Fourth Judicial District had a policy of not seeking the death penalty in any First Degree Murder case if the defendant would plead guilty and agree to a life sentence. Consequently, during that period, the death penalty was sought in only one case: State v. Baldwin, 388 So.2d 664 (La.1980). The defendant in Baldwin elected to go to trial instead, and he was convicted, sentenced to death, and executed.
[29] In Divers, supra, this Court reversed the conviction and sentence based on the erroneous denial of defense challenges for cause, and Divers evidently remains in custody pending retrial of the case.
[30] See, e.g., State v. Connolly, 96-1680 (La.7/1/97), 700 So.2d 810; State v. Comeaux, 93-2729 (La.7/1/97), 699 So.2d 16; State v. Martin, 93-0285 (La.10/17/94), 645 So.2d 190; State v. Wille, 595 So.2d 1149 (La.1992); State v. Lee, 559 So.2d 1310 (La.1990); State v. Copeland, 530 So.2d 526 (La.1988), cert. denied, 489 U.S. 1091, 109 S.Ct. 1558, 103 L.Ed.2d 860, reh'g denied, 490 U.S. 1077, 109 S.Ct. 2092, 104 L.Ed.2d 655 (1989); State v. Eaton, 524 So.2d 1194 (La.1988), cert. denied, 488 U.S. 1019, 109 S.Ct. 818, 102 L.Ed.2d 807, reh'g. denied, 489 U.S. 1061, 109 S.Ct. 1332, 103 L.Ed.2d 600 (1989); State v. Carmouche, 508 So.2d 792 (La.1987); State v. Williams, 490 So.2d 255 (La.1986); State v. Loyd, 489 So.2d 898 (La.1986) (fourth penalty phase hearing presently pending); State v. Jones, 474 So.2d 919 (La.1985); State v. Brogdon, 457 So.2d 616 (La.1984), cert. denied, 471 U.S. 1111, 105 S.Ct. 2345, 85 L.Ed.2d 862, reh'g denied, 473 U.S. 921, 105 S.Ct. 3547, 87 L.Ed.2d 670 (1985); State v. Watson, 449 So.2d 1321 (La.1984); State v. Rault, 445 So.2d 1203 (La.1984); State v. Celestine, 443 So.2d 1091 (La.1983); State v. Flowers, 441 So.2d 707 (La.1983), cert. denied, 466 U.S. 945, 104 S.Ct. 1931, 80 L.Ed.2d 476 (1984), rev'd, 779 F.2d 1115 (5th Cir.1986) (remanded for new trial), 509 So.2d 588 (La.App. 5th Cir.1987) (conviction and life sentence affirmed); State v. Willie, 436 So.2d 553 (La. 1983); State v. Moore, 414 So.2d 340 (La. 1982).