# Supreme Court of Louisiana

FOR IMMEDIATE NEWS RELEASE
NEWS RELEASE #030

FROM: CLERK OF SUPREME COURT OF LOUISIANA

The Opinions handed down on the **29th day of June, 2026** are as follows:

**BY Cole, J.:**

2025-KP-01014     STATE OF LOUISIANA  VS.  JIMMIE C. DUNCAN (Parish of Ouachita)

AFFIRMED. RELIEF GRANTED UNDER LA.C.CR.P. ART. 930.3(8). SEE OPINION.

Weimer, C.J., additionally concurs and assigns reasons.
McCallum, J., additionally concurs and assigns reasons.
Penzato, J., concurs in the result.

# SUPREME COURT OF LOUISIANA

## No. 2025-KP-01014

## STATE OF LOUISIANA

## VS.

## JIMMIE C. DUNCAN

### On Writ of Certiorari to the Court of Appeal, Second Circuit, Parish of Ouachita

**COLE, J.**[*]

Defendant Jimmie C. Duncan was convicted of the first degree murder of 23-month-old Haley Oliveaux, a violation of La. R.S. 14:30, and was sentenced to death. This Court affirmed the conviction and death sentence in *State v. Duncan*, 99-2615 (La. 10/16/01), 802 So. 2d 533, and the United States Supreme Court denied certiorari review. *See Duncan v. Louisiana,* 536 U.S. 907 (2002).

During post-conviction proceedings, Duncan raised claims of factual innocence pursuant to La. C.Cr.P. art. 926.2 and ineffective assistance of counsel, among other claims. The trial court granted relief, setting aside his conviction and sentence and granting relief under both La. C.Cr.P. art. 930.3(1) (ineffective assistance) and art. 930.3(8) (factual innocence). For the reasons set forth below, in light of the exceptional circumstances here, we affirm the trial court's finding that Duncan carried his burden of proof under La. C.Cr.P. art. 926.2 and is entitled to relief under La. C.Cr.P. art. 930.3(8). Because we find no abuse of discretion in the trial court's grant of relief, we pretermit discussion of Duncan's remaining claims.

---

[*] Judge Allison H. Penzato of the Court of Appeal, First Circuit, appointed as Justice pro tempore, sitting for the vacancy in the First District. She is now appearing as an ad hoc for Justice William Burris.

# FACTUAL BACKGROUND

The evidence presented at Duncan's 1998 trial is summarized in *State v. Duncan*, 99-2615 (La. 10/16/01), 802 So. 2d 533 ("*Duncan I*"), and is more fully developed in the record before this Court. To place the post-conviction evidence in context, we first summarize the trial evidence relevant to post-conviction review, including both evidence discussed in *Duncan I* and evidence contained in the trial record but not addressed in that opinion. In short, at trial, the state theorized that Duncan violently attacked and bit Haley, raped her, then drowned her and staged the scene to avoid detection. The defense theory was that Haley, who had been taken twice to the hospital in the preceding months for possible seizures, drowned after suffering a seizure in the bathtub. The defense also theorized that any assault was committed by someone else.

We then turn to evidence introduced at the post-conviction hearing. Duncan argues his newly-presented evidence does not merely impeach isolated trial testimony, but instead entirely undermines the factual premises on which the state's theory depended.[1] There has been considerable focus on two of the state's key experts, including their involvement with multiple wrongful convictions, and many convictions involving their work have been vacated. Duncan points to new evidence seriously undermining the reliability of the forensic work of those experts, post-trial developments in bite mark analysis and pediatric forensic pathology, expert testimony that Haley's death was more consistent with accidental drowning than forcible drowning, and evidence contradicting a jailhouse informant's account of his alleged confession.

---

[1] The trial court granted Duncan relief pursuant to his factual innocence claim brought under La. C.Cr.P. art. 926.2. The trial court found there was "new, reliable, and noncumulative evidence that would be legally admissible at trial and that was not known or discoverable at or prior to trial" and that this evidence, when viewed "in light of all the relevant evidence," proves by clear and convincing evidence that, had the new evidence been presented at trial, no rational juror would have found Duncan guilty beyond a reasonable doubt.

## Duncan's 1998 Trial

In December 1993, Duncan was 25 years old and shared an apartment in West Monroe with his girlfriend, Allison Oliveaux, and her 23-month-old daughter from a prior marriage, Haley Oliveaux. *Duncan I*, 99-2615, p.2, 802 So. 2d at 538.[2] It has never been disputed that Haley drowned on December 18, 1993, while she was in Duncan's care. Though the state initially contemplated charging Duncan with negligent homicide, after Haley's autopsy he was charged with first degree murder.

***The Timeline and Physical Evidence.*** Allison testified that when she left for work at approximately 8:30 a.m. on the morning of December 18, 1993, Haley was alone with Duncan, and she appeared healthy and in good spirits.

Around 10:30 a.m., Duncan knocked on the door of his neighbors, Floyd and Wynette Bennett, carrying Haley's lifeless body wrapped in a towel. *Id*. While Mr. Bennett attempted CPR, the Bennetts' son called 911 and an ambulance was dispatched. Both Mr. and Mrs. Bennett described Haley as blue and cold. Neither recalled seeing any blood on Haley or on the white towel in which she was wrapped.[3]

Haley was intubated in the ambulance and again in the emergency room, but despite extensive efforts to revive her, she was pronounced dead at 11:15 a.m. One of the treating physicians, Dr. Charles Norwood, testified to observing "severe" wounds to her anus. Although he expected to see blood or blood clotting, none was present, leading him to believe the area had been "cleaned up."

Duncan gave multiple statements explaining that while Haley was taking a bath, she defecated in the tub, so he cleaned her and the tub, then placed her back in fresh bath water. He said he was washing dishes when he heard splashing, and when he checked on Haley, he found her unresponsive. After unsuccessfully attempting

---

[2] Because mother and daughter shared a last name, we refer to them as "Allison" and "Haley."

[3] Mr. Bennett also testified that between 9:45 and 10 a.m., he saw Duncan walk to the corner store and return smoking a cigarette, although the lead detective testified that the store clerk did not recall Duncan coming to the store.

CPR, he ran next door for help. During the second police interview the day Haley died, after being confronted with Haley's anal injuries, Duncan stated that when he removed Haley from the tub, he "grabbed her by her butt and by her neck," shook her, and tried to perform CPR. He also said that when he cleaned Haley after her earlier accident, he washed "around her little butt hole." *Duncan I*, 99-2615, pp.4-6, 802 So. 2d at 539-40.

Detective Chris Sasser, who led the investigation, visited the residence approximately six times and photographed the scene. He acknowledged that much of Duncan's account "checked out." Detective Sasser testified that he searched "every conceivable area" of the house where there could be blood, but he found no blood, no evidence of clean up, and no freshly washed clothing items. He also used a black light to search for semen and found no evidence of semen anywhere. Testing of Duncan's blood and urine, clothing, and a diaper collected from the bathroom revealed no blood, seminal fluid, or spermatozoa, and Duncan's samples were negative for alcohol or controlled substances. Based on the initial investigation, Detective Sasser recommended charging Duncan with negligent homicide.

***The Bite Mark Evidence.*** Haley's autopsy altered the direction of the investigation. Haley's body was transported from the hospital to the morgue in Jackson, Mississippi, where Dr. Stephen Hayne performed the autopsy. That evening, Detective Sasser received a call from Dr. Hayne, who reported injuries he observed on Haley's body. Based on Dr. Hayne's subsequent report, the charge was upgraded from negligent homicide to first degree murder.[4] *Duncan I*, 99-2615, p.8, 802 So. 2d at 542 ("The only direct link the prosecution was able to make between the victim's injuries and the defendant was premised on the bite mark evidence.").

---

[4] Detective Sasser, along with other law enforcement personnel, attended the autopsy. He recalled that blood samples were taken and a rape kit was completed during the autopsy. The rape kit was analyzed and no seminal acid phosphatase or spermatozoa were detected. Haley's blood samples were stored in the wrong location and disposed of before any testing was performed.

At trial, Dr. Hayne testified that Haley suffered "significant acute injuries" at or around the time of death, including abrasions and bruises on her cheeks, lips, frenulum, scalp, jaw, neck, extremities, belly, knee, and ankle. Because he believed certain marks on Haley were "manifestations of a bite mark," he sought assistance from forensic odontologist Dr. Michael West and requested that Detective Sasser obtain molds of Duncan's teeth. Regarding the source of the alleged bite marks, Dr. Hayne testified that, "to a reasonable medical certainty," the marks on Haley's cheeks did not come from removal of adhesive tape used during the intubation.

Although Dr. West performed the bite mark examination, the state did not call him at trial. The state instead called forensic odontologist Dr. Neal Riesner, who explained that he was testifying because Dr. West had been sanctioned by the American Board of Forensic Odontology (ABFO) for overstating his credentials and "describing pattern injuries that were not due to teeth." According to Dr. Riesner, the ABFO found Dr. West not qualified to testify and suspended his membership for one year. Dr. Riesner testified that "within [a] reasonable medical dental certainty" the marks on Haley's cheek and neck "matched" or were consistent with Duncan's lower teeth, and the mark on her elbow was consistent with Duncan's upper teeth.

The defense called forensic odontologist Dr. Richard Souviron, who disagreed with Dr. Riesner and testified he identified no bite marks in the photographs of Haley he reviewed and concluded the abrasions on Haley's face resulted from removal of adhesive tape. He noted that if there had been bite marks, they would have been observed by emergency room staff. He questioned why Dr. West did not perform certain standard ABFO procedures, such as impressions, saliva samples, and bite prints with print powder. The defense's forensic pathologist, Dr. Robert Kirschner, also testified to his conclusion that "[t]here are no bite marks on this child" and he was "quite surprised to learn that someone was going to come in and testify that in fact there were bite marks."

5

***The Sexual Assault Evidence.*** The state's theory of sexual assault rested principally on the testimony of Dr. Hayne and Dr. Edward Gustavson. Dr. Hayne described Haley's anal injuries as "severe tearing," which he testified could cause life-threatening blood loss, although he acknowledged on cross-examination that he found no evidence that blood loss had occurred. He testified that although there was bleeding in the tissue, there was no bleeding on the skin surface of the anus or mucosal surface of the rectum, which indicated the area had been washed. He concluded the injuries were "consistent with" penetration by an adult male penis.

Dr. Gustavson, an expert in pediatrics and intensive care pediatrics, did not examine Haley's body but relied on photographs and medical reports. Reviewing a photograph of Haley's anus, he testified it was "the worst anal case of sexual abuse" he had ever seen. He described the "anal tears" as "over a quarter inch deep" and "at least an inch long," and testified Haley would not have stopped bleeding while alive and would have died of blood loss or hemorrhaging. He testified that, within reasonable medical certainty, Haley had been raped by an adult male penis and there was no other explanation for her injuries.

The defense's forensic pathologist Dr. Kirschner disagreed with the state's experts regarding the extent and implications of Haley's anal injuries. He testified that a photograph of Haley's anus showed lacerations but no evidence of internal injury that would have been caused by full penetration of an adult penis. He testified these injuries would cause bleeding, but not enough to bleed to death. Though he disagreed with the state on these points, Dr. Kirschner opined on cross-examination that Haley's death was a homicide.

***The Forcible Drowning Evidence.*** Dr. Hayne determined that Haley's cause of death was consistent with freshwater drowning. He testified that a contusion on her head may have been caused by "a thumb or finger pressing down on the back of the head" and markings on her cheek and neck were consistent with someone holding

her head under water. He also testified he saw nothing in the autopsy indicating the possibility of a pre-death seizure.[5] Dr. Hayne estimated that Haley had been dead for "approximately 45 minutes to an hour or even slightly longer" before arriving at the hospital, supporting the state's theory of an attempted coverup.[6]

The defense theory, by contrast, emphasized Haley's seizure history and the possibility she drowned after suffering a seizure in the bathtub. Allison testified that Haley had suffered two seizures during her life, including one incident about a month before her death in which Allison found Haley "stiff as a board" with her eyes "rolled up in her head." Haley went limp and stopped breathing, prompting Allison to take her to the hospital. Dr. Norwood testified that he treated Haley for a suspected febrile seizure or a possible reaction to medication on that occasion. Dr. Kirschner testified people with seizure activity "have a very high risk of dying drowning in bathtubs" though, as noted above, he ultimately testified Haley's death was due to homicide.

***The Jailhouse Informant.*** The state also called Michael Cruse, who briefly shared a cell with Duncan at the Ouachita Parish jail. Cruse testified that, on or about December 28, 1993, he woke to find Duncan "ranting and raving" about his innocence. According to Cruse, Duncan was sobbing and rambling, telling Cruse that "the baby was pointing at his penis and that he said something about a bottle or bobble." Then, Cruse testified, Duncan said "it must [have] been the devil in him cause the next thing he knew he blacked out again and when he came to, he was trying to have sex with the baby." Cruse further testified that Duncan said that "he couldn't get the baby to be quiet," and "all he wanted was for the baby to stop."

---

[5] Although Haley's blood was drawn, Dr. Hayne did not test it for medications or toxins, and, as noted above, the blood sample was mistakenly destroyed before trial.

[6] Dr. Hayne also testified that if Haley had eaten oatmeal for breakfast the morning she died, there would be some present in her stomach or small bowel, and he found none. This was additional testimony supporting the state's coverup theory.

The jury returned a verdict of guilty as charged and found three aggravating circumstances: Duncan was engaged in the perpetration of aggravated rape or attempted aggravated rape, the victim was under the age of 12, and the offense was committed in an especially heinous, atrocious, or cruel manner. Duncan was sentenced to death by lethal injection. This Court affirmed on direct appeal. *Duncan I*, 99-2615, p.40, 802 So. 2d at 560.

**Post-Conviction Proceedings**

Duncan filed a pro se post-conviction relief application in 2002 that was supplemented by counsel in 2008 and 2022. The application alleged, *inter alia*, factual innocence pursuant to La. C.Cr.P. art. 926.2 and ineffective assistance of counsel. Duncan argued that new evidence unavailable at trial undermined the testimony and conclusions of the state's experts, Dr. Hayne and Dr. West, whose opinions had supplied the foundation for the state's theory that Haley was bitten, sexually assaulted, and forcibly drowned. He also argued that Cruse's testimony had been contradicted by another former cellmate.

The trial court held a six-day evidentiary hearing in September 2024. The post-conviction evidence was directed principally at the alleged bite marks, the alleged sexual assault, and the alleged forcible drowning.

***The Testimony Regarding the State's Expert Witnesses.*** Duncan called University of Mississippi Law School Professor William Tucker Carrington to testify as a legal historian with expertise on wrongful convictions related to the practices of Dr. Hayne and Dr. West. Professor Carrington has authored law review articles and a book about the men and their practices. He described investigative and judicial findings, developed after Duncan's trial, concerning Dr. Hayne's and Dr. West's work. In summary, Professor Carrington testified that later investigations and proceedings have linked Dr. Hayne and Dr. West to unethical business practices,

false or misleading representations about qualifications, and a record of at least six wrongful convictions connected to their forensic work since Duncan's 1994 trial.[7]

With respect to Dr. Hayne's business practices, Professor Carrington testified that during portions of the relevant period, including when Haley's autopsy was performed, Dr. Hayne was conducting 800 to 1,000 autopsies each year, far exceeding National Association of Medical Examiners (NAME) guidelines of 250 autopsies. He questioned how "any sort of human being could be doing that volume" of autopsies. According to documentary evidence Professor Carrington reviewed, this generated approximately $1.5 to $2 million annually. Professor Carrington also identified serious errors in Dr. Hayne's autopsy reports, including unsupported conclusions, failure to preserve tissue samples, and poor documentation.[8]

Professor Carrington also testified about the working relationship between Dr. Hayne and Dr. West, explaining that, as a matter of practice, Dr. Hayne would frequently perform an autopsy, note some sort of "pattern injury," then refer the case to Dr. West for his expertise in bite mark "matching" through his "direct comparison" method or videotape enhancement. He testified that their working relationship was "common knowledge" and that both had financial incentives to continue that relationship.[9] According to Professor Carrington, Dr. West's "direct

---

[7] Evidence admitted in connection with Professor Carrington's testimony includes two law review articles he wrote and excerpts from the book he wrote about the men, including related citations. *See* K.C. Meckfessel Taylor, Marielle Elisabet Dirkx, William Mcintosh, and W. Tucker Carrington, *CSI Mississippi: The Cautionary Tale of Mississippi Medico-Legal History*, 82 Miss. L.J. 1271 (2013); Tucker Carrington, *Mississippi Innocence: The Convictions and Exonerations of Levon Brooks and Kennedy Brewer and the Failure of the American Promise*, 28 Geo. J. Legal Ethics 123 (2015); Radley Balko & Tucker Carrington, *The Cadaver King and the Country Dentist: A True Story of Injustice in the American South* (Public Affairs 2018).

[8] Professor Carrington recalled an autopsy report authored by Dr. Hayne that described the weight and measurement of a spleen in a man whose spleen had been removed years before he died. In another report, Dr. Hayne described a prostate in a female baby. Documentation underlying Professor Carrington's testimony describes additional "egregious mistakes" in Dr. Hayne's autopsies, including one where he noted in his report that "he had removed and examined the decedent's ovaries and uterus," but the victim was male.

[9] An excerpt from his book admitted during Professor Carrington's testimony notes that the exact nature of the relationship between Dr. Hayne and Dr. West is unknown and that both men "apparently lost or destroyed most of their financial records, personal records, autopsy records, and correspondence with police and prosecutors over the years."

comparison" method involved taking the "dentition of a suspect and trying to determine whether or not it matches the purported bite marks" on the victim. Dr. West's specific method involved pressing a dental mold into the skin of the victim onto "what he believed or claimed were bite marks."

Professor Carrington testified about multiple wrongful convictions attributable to the work of one or both doctors. He particularly noted two related Mississippi cases in which Dr. Hayne identified supposed bite marks, Dr. West confirmed and "matched" them to defendants using his "direct comparison" method, and the defendants were later exonerated by DNA evidence.[10]

***The West Video and the Alleged Bite Mark Evidence.*** As this Court noted in its original opinion, "[t]he only direct link the prosecution was able to make between the victim's injuries and the defendant was premised on the bite mark evidence." *Duncan I*, 99-2615, p.8, 802 So. 2d at 542. Duncan called two experts at the post-conviction hearing to testify about Dr. Michael West's work in connection with Haley's case, including about a video in which Dr. West performs his "direct comparison" method using Duncan's dental molds on Haley's body ("West Video").

Duncan first called Dr. Lowell Levine, an expert in forensic odontology and one of the founders of the American Board of Forensic Odontologists ("ABFO").[11] Dr. Levine testified that Dr. West's "direct comparison" method was never approved by the ABFO and is something he only knew Dr. West to have performed. Because this method involves placing dental molds on the skin, he explained, it risked creating evidence that is not there, destroying or compromising existing evidence,

---

[10] *See State of Mississippi v. Brewer*, No. 5999 (Ms. Cir. Ct. Noxubee County, Feb. 15, 2008) (order dismissing charges); *State of Mississippi v. Brooks*, No. 5937 (Ms. Cir. Ct. Noxubee County, Mar. 13, 2008) (dismissing charges and stating the court found "circumstances indicative of actual innocence"). Professor Carrington wrote about these cases in his book and the law review articles that were admitted in connection with his testimony. *See supra* n.7. Professor Carrington also testified to multiple other wrongful convictions attributable to one or both doctors.

[11] In 1994, Dr. Levine was approached by the Ouachita Parish District Attorney's Office to consult on Haley's death. After learning the examination had been performed by Dr. West, he declined to do so, instead referring the office to Dr. Riesner.

and contaminating the body with external evidence. He explained that instead of pressing dental molds into a victim's skin to make comparisons, the ABFO developed measuring tools, including a special ruler, to be used with "precise, exact life-sized photographs." Dr. Levine also explained that current ABFO guidelines do not recommend an odontologist use the terms "match" or "within a reasonable dental certainty," although those terms were permissible in 1994. Today, an odontologist can say, at most, that he "cannot exclude" a person from having made the marks.

The West Video was played for the trial court, and Dr. Levine testified he was "appalled" to watch Dr. West "pushing the teeth into the tissue with force." He testified that Dr. West's actions in the video "destroyed" and "compromise[d]" the evidence. He further explained that the ABFO requires an odontologist to maintain a photo log tracking each photograph taken of the deceased, but Dr. West did not do so. As a result, there is therefore no way to determine whether the photographs relied on by Dr. Riesner were taken before or after Dr. West pressed the molds of Duncan's teeth into Haley's skin. He also opined that Dr. West's report, which consisted of a one-page letter, was "totally inadequate," because it stated conclusions without any basis or a description of the technique used to come to those conclusions.

With respect to the West Video and bite mark evidence generally, Duncan also called Dr. Adam Freeman, a dentist and expert in forensic odontology. Dr. Freeman was certified by the ABFO in 2009 and rose to become president of the organization. He testified to the evolving views of bite mark examination within the forensic odontology community.

Dr. Freeman testified that the scientific understanding of bite mark identification changed significantly in 2009, when the National Academy of Science published a report on the status of forensic science in the United States (NAS Report). The NAS Report concluded that bite mark evidence lacked a scientific basis, that skin is a poor medium for capturing pattern injuries, and that bite mark

analysis is prone to bias. As chair of an ABFO bite mark committee, Dr. Freeman conducted studies asking certified forensic odontologists to determine whether injuries depicted in photographs were human bite marks. Dr. Freeman described the results of his study as "completely devastating," because even the top board-certified forensic odontologists in the country could not agree on whether a mark was a human bite mark.[12]

Turning to this case, Dr. Freeman and another forensic odontologist reviewed the evidence and drafted a joint affidavit. They worked independently and were not aware of each other's conclusions before drafting the affidavit. As to the mark under Haley's right ear, they found it was a "diffuse bruise" without class characteristics or individual characteristics to meet the ABFO definition of a bite mark. As to the mark on Haley's elbow, they again found it to be a diffuse bruise. Dr. Freeman testified that "[i]t is scientifically indefensible to state that that is a human bite mark and that [] those are the teeth of a specific individual."[13]

Dr. Freeman was shown the West Video and noted that "you can see where Dr. West is actually pushing the cast into the skin of this child." He described Dr. West's "direct comparison" method as "an indefensible method that nobody else in the ABFO used." Like Dr. Levine, Dr. Freeman testified that by performing this

---

[12] Dr. Freeman similarly testified about three additional bite mark studies, all of which had poor results for the reliability of bite mark identification. One study, performed by the Texas Forensic Science Commission, reached results similar to those in the NAS Report and resulted in a moratorium on the use of bite mark evidence in criminal cases in Texas. Another study, performed by the President's Council of Advisors on Science and Technology, reached the same conclusions as the NAS and the Texas studies, finding, *inter alia*, no scientific basis for bite mark analysis, marks on skin did not replicate reliably, and practitioners could not identify a perpetrator. Finally, the National Institute of Standards and Technology (NIST) issued a report that Dr. Freeman described as "the worst" of the studies. He testified that according to the NIST report, a bite mark cannot be diagnosed or accurately transferred to skin, skin is a poor recording medium, and the evidence is of such poor quality that it cannot be relied on to either include or exclude a person as the biter. According to Dr. Freeman, the NIST report found bite mark analysis to be "essentially [] junk science."

[13] Defense expert Dr. Judy Melinek's pathology review was consistent with this conclusion. She testified "[n]othing resembling a bite mark is visible in the available photographs and video," demonstrated that marks on Haley's face align with the tape used to hold the intubation tube, and opined that Dr. West's "direct comparison" method damaged the skin in a way that could make non-bite mark injuries appear consistent with bite marks.

method, Dr. West was destroying evidence while also "creating marks" on the skin. He further testified that the angles at which Dr. West held the molds were a "physical impossibility" for a human jaw "unless we become snakes where we can dishinge our joints which we cannot." Dr. Freeman explained that although some members of the ABFO continue to support the use of bite mark evidence despite the testing and research he described, none would endorse Dr. West's procedure.[14] This is important in the context of the trial evidence of Dr. Souviron opining that bite marks did not appear in photos he reviewed.

The state called one witness at the post-conviction hearing, former detective Chris Sasser. Relevant to the issues presented to the Court, Detective Sasser testified that he observed Dr. West place Duncan's dental impressions on Haley's body, but he denied that Dr. West made any marks that were not already there.

***The Autopsy and the Alleged Sexual Abuse Evidence.*** As this Court noted in its original opinion, "[a] thorough search of the crime scene revealed neither blood nor semen. Nor was any blood found on defendant's body or attire." *Duncan I*, 99-2615, p.8, 802 So. 2d at 542. Despite the absence of such evidence, the original trial testimony was that Haley had been a victim of severe sexual abuse.

At the post-conviction hearing, Duncan called Dr. Robert Bux, a board certified anatomical, clinical, and forensic pathologist, to testify regarding his review of this case.[15] Dr. Bux rejected Dr. Hayne's conclusions regarding both forcible

---

[14] Dr. Freeman testified that Dr. Riesner was exposed to biasing information before he conducted his examination, because he was given a single suspect and told that bite marks had been found on the deceased child. Dr. Freeman compared this procedure to conducting a police lineup with one suspect. Under current ABFO guidelines, the examiner would be blinded and given multiple suspects before being asked to do similar work. Dr. Freeman also criticized Dr. Souviron's trial testimony as not scientifically defensible under modern standards, because he stated that he was able to diagnose a human bite mark and could exclude a person from having made the mark.

[15] Unlike Dr. Hayne, Dr. Bux relied, in part, on Detective Sasser's "excellent" investigation, including Duncan's account of Haley's death and photographs from inside the home.

drowning and sexual assault, testifying that Dr. Hayne lacked appropriate forensic pathology training and was never board certified in forensic pathology.[16]

Dr. Bux testified that Dr. Hayne's autopsy of Haley was "inadequate," "sloppy," "below the standard of care," and misrepresented findings. Dr. Bux noted the absence of photographs, tissue samples, or microscopic slides, as well as contradictions between Dr. Hayne's observations and conclusions. Dr. Bux testified that the pathology seen in Haley's anus and rectum was not due to trauma or rape, but was attributable to inflammation related to disease, diaper rash, rough washing, or hard stool. He explained that the scientific understanding of factors potentially indicative of sexual abuse has changed since 1993, noting that a "consensus" emerged around 2007-2008 that a dilated anus alone is not necessarily indicative of sexual abuse, but instead "means nothing" and is seen "all the time." He further testified that at trial, the defense expert Dr. Kirshner erroneously relied on Dr. Hayne's findings without personally reviewing or analyzing any tissue samples or physical evidence.

In his report, which was entered into evidence at the post-conviction hearing, Dr. Bux opined that aspects of Dr. Hayne's documentation failures "suggest that at least some of his observations were likely fabricated." He explained that tissue sampling, internal organ analysis, and microscopic examination of Haley's rectum and anus could not have been completed in the available time and were not adequately documented, including lacking any depth measurement for purported lacerations.

With respect to the autopsy and sexual abuse evidence, Duncan also called Dr. Judy Melinek, a board-certified expert in anatomical, clinical, and forensic pathology, who explained that the doctors who testified at trial erred in numerous

---

[16] Dr. Bux's report goes into detail regarding Dr. Hayne's qualifications, noting he did not have "the appropriate credentials to be relied upon to make the conclusions that he did in this case."

ways. She found Dr. Hayne's work "suffered from terrible methodological failures" and his methods and interpretation were "out of line even for what was acceptable in 1993." She also testified that more recent scientific studies have shown that natural disease, accidental injury, stooling, and other non-abusive conditions can produce anal findings that "mimic" injuries once attributed to sexual abuse. Since the 1980s and 1990s, certain studies have found that what appeared to be trauma or sexual abuse were instead medical conditions or postmortem changes.

With respect to Haley, Dr. Melinek's report stated that the anal injuries were superficial and consistent with "toddlers who are toilet training when a caregiver attempts to clean them following a toileting accident," as Duncan reported doing. She further testified that penetration of a toddler anus by an adult male penis would have caused "devastating internal injur[ies] with hemorrhage," neither of which were documented at the autopsy. Moreover, the anal dilation observed at the hospital is a "common post-mortem change," not an indication of trauma.[17] To that end, Dr. Melinek disagreed with Dr. Gustavson's conclusion that Haley's injuries were so severe as to result in extreme blood loss, pointing out that no such blood loss was documented in Haley's medical records. Additionally, and critical to the outcome here, there was also no evidence of blood loss or cleaning at the residence, despite a thorough and well-documented search.

***The Alleged Forcible Drowning Evidence.*** Dr. Bux also addressed cause of death and opined that Haley's cause of death was accidental drowning. He testified that, if someone had held Haley's head under water, he would expect to see injuries to the front of her body, particularly on her forehead, nose, shoulders, or knees. In this case, however, he saw no evidence of forced drowning causing death, noting

---

[17] Dr. Melinek also disputed Dr. Hayne's testimony that the absence of inflammation showed the anal injuries must have occurred approximately 30 minutes before Haley's death. She explained that the proper methodology for aging injuries involves using special stains on tissue slides, not simple observation, and there is no indication Dr. Hayne performed this procedure. In any event, the earliest acute inflammatory activity is seen at four hours after injury, not 30 minutes.

specifically that Dr. Hayne's autopsy documented no such injuries and that injuries to her face were best explained as having been made by the medical tape used when she was intubated. He also testified that the documented injuries were consistent with Duncan's account of cleaning Haley after the toileting accident, removing her from the tub, and attempting to revive her.

Dr. Melinek also addressed the forcible drowning theory, testifying that Dr. Hayne's conclusion of forcible drowning was "wildly inappropriate." She opined that Haley died from complications of drowning likely due to epilepsy that had possibly been exacerbated by recent head trauma. She explained that Haley had suffered several skull fractures a few weeks before her death when a piece of furniture fell on her head.[18] She explained that though head trauma was known in the 1990s to increase seizure risk, scientific understanding of post-traumatic epilepsy has since advanced. She described Dr. Hayne's conclusion that a bruise on Haley's head or neck was a thumb mark from forcible drowning as "way off and beyond what even would have been acceptable testimony" at trial.[19]

As to the time of Haley's death, Dr. Melinek explained in her report that Dr. Hayne's testimony that Haley was dead for 45 minutes before she arrived at the hospital is belied by the absence of rigidity and a body temperature of 98.6 degrees. Her report noted that determining time of death by touching skin is "subjective" and "unreliable," especially in a child who had been "naked and immersed in water."

***Jailhouse Informant Evidence.*** Duncan called licensed private investigator Don Carter, who was hired by post-conviction counsel in 2008 to take statements from Cruse and Michael Lucas, a former cellmate of Duncan and Cruse. Cruse hung

---

[18] The state and Duncan's counsel entered a stipulation at trial to exclude certain evidence related to Haley's medical history, including the injuries and hospitalization related to this accident.

[19] Dr. Melinek explained that Dr. Hayne's comment that "the brain showed no evidence of seizure activity" did not make sense because a seizure is an electrical disturbance in the brain and there is no electrical activity in a dead brain.

up when Carter contacted him. Lucas, who had since become unavailable to testify due to a stroke, signed a written statement after meeting with Carter. In that statement, Lucas recalled that Duncan denied responsibility for Haley's death and that he never saw Duncan have a conversation with Cruse: "All I ever seen was Michael hound him about his charge, never a conversation." Carter testified that Lucas recalled Cruse hassling Duncan about his charge and Duncan crying and repeatedly saying he "did not do it."[20]

***Ineffective Assistance of Counsel Evidence.*** Duncan's final witness was James Boren, who was offered and accepted without objection as an expert in capital criminal defense. Mr. Boren opined that trial counsel failed to: develop a coherent defense theory (in part, by conceding Haley was sexually assaulted, while denying it was Duncan); adequately investigate viable defenses; provide experts with critical evidence sufficient to form reliable opinions (particularly the West Video and information from Haley's prior hospital visits); impeach Cruse's alleged confession testimony; and address a disqualifying conflict of interest.

## Trial Court Ruling

On April 23, 2025, the trial court granted Duncan's post-conviction claims of factual innocence and ineffective assistance of counsel, and on May 19, 2025, vacated his conviction and sentence. The trial court concluded that Duncan carried

---

[20] In 2008, Carter met with Lucas for about two and a half hours and took a statement from him. Lucas showed Carter his driver's license to confirm his identity. Carter prepared a written statement as they spoke but did not record the conversation. Lucas reviewed the statement, had the opportunity to make edits, and signed it, although the statement was not notarized. The state objected to the admission of the statement, and the defense argued it was admissible because Lucas had become unavailable to testify due to his stroke.

The trial court opted to admit the hearsay statement on the grounds that it was sufficiently trustworthy. This does not fall within the scope of evidence allowed under La. C.Cr.P. art. 930(B). In this context, the reliance on hearsay of what a witness told an investigator working for the defense was not appropriate. In any event, the testimony is not impactful, since Lucas cannot possibly have knowledge of what conversations transpired between Cruse and Duncan at every moment of every day. Despite this holding, we do not find Cruse's trial testimony sufficient to support a conviction in light of all the evidence adduced here.

his burden under La. C.Cr.P. art. 926.2, noting "a wide divide between what was presented at the original trial of Petitioner and what could be presented now."

*Factual Innocence.* In written reasons, the trial court found Haley drowned in the bathtub on December 18, 1993, after having suffered seizures and injuries in the weeks before her death. The court noted that Duncan consistently told police he may have accidentally injured Haley while cleaning her after she defecated in the tub, and that the initial investigation did not reveal blood, semen, signs of struggle, or evidence of a cleanup. Neither the medical professionals, child protective services, nor the coroner's office reported any concerns about bite marks. The court also noted that Duncan's statements were largely consistent with Detective Sasser's investigation, and that the charge was upgraded from negligent homicide to first degree murder only after Dr. Hayne and Dr. West reported their conclusions concerning possible bite marks.

Against that factual background, the trial court found that Duncan's conviction turned substantially on forensic evidence offered by experts whose reliability "appear[s] questionable at best." The court described the West Video, noting that Dr. West's "direct comparison technique" has been "seriously questioned," and that the video showed him "forcibly thrust[ing]" Duncan's dental molds into areas of Haley's face and body "in a rather disturbing manner and to a rather disturbing degree." The court also found serious problems with Dr. Hayne's autopsy and conclusions of anal rape and forcible drowning, particularly given the lack of physical evidence supporting sexual assault, bleeding, or cleanup.

The court relied on the post-conviction testimony of Dr. Levine, Dr. Freeman, Dr. Bux, Dr. Melinek, Professor Carrington, and Detective Sasser. It emphasized that bite mark science generally and Dr. West's method specifically had been seriously undermined; Dr. Bux found Dr. Hayne's autopsy "inadequate," "sloppy," "below the applicable standard of care," with "failures in its documentation" and

18

"professional independence issues"; Dr. Melinek "convincingly testified" Haley died as a result of accidental drowning rather than homicide; and Professor Carrington described serious reliability concerns surrounding Dr. Hayne and Dr. West, including his testimony that Dr. Hayne provided "untruthful" testimony, engaged in unethical business practices, and was "untruthful about his credentials." The trial court also found compelling Detective Sasser's testimony that "he found no blood, no signs of struggle, no cleaning rags, and no cleaning agents" at the scene, which the court stated "discredited" the state's assertion that Haley suffered massive blood loss.

***Ineffective Assistance of Counsel.*** The trial court also granted relief under La. C.Cr.P. art. 930.3(1), relying principally on Mr. Boren's testimony that trial counsel failed to investigate and present available evidence, failed to develop a coherent defense theory, and failed to disclose a conflict of interest

The trial court granted post-conviction relief and set aside Duncan's conviction and sentence. It additionally authorized the state to take further action consistent with La.C.Cr.P. art. 926.2(C)(1).

## Procedural Posture

After the trial court granted defendant relief, the state filed a writ application and this Court granted the writ. *State v. Duncan*, 25-1014 (La. 11/19/25), 422 So. 3d 777. Thereafter, the trial court set bail, and Duncan was released from custody with the support of both Haley's paternal and maternal family members.

## ANALYSIS

The standard of review of a trial court's ruling on an application for post-conviction relief is abuse of discretion. *State ex rel. Robinson v. Vannoy*, 21-0812, p.7 (La. 12/13/24), 397 So. 3d 333, 348, *aff'd on reh'g*, 21-0812 (La. 6/27/25), 413 So. 3d 403, *cert. denied*, -- S. Ct. --, 2026 WL 1463230 (2026). This Court has previously explained that a standard of review analysis "may be further broken down

19

into components of the trial court decision. When a trial court makes findings of fact based on the weight of the testimony and the credibility of the witnesses, a reviewing court owes those findings great deference and may not overturn those findings unless there is no evidence to support them. Legal findings or conclusions of the trial court are reviewed de novo." *State v. Thompson*, 11-0915, pp.13-14 (La. 5/8/12), 93 So. 3d 553, 563 (quotation marks omitted). The same "component parts" analysis applies to our review in post-conviction proceedings. *State v. Turner*, 25-0209, p.3 (La. 3/6/26), 429 So. 3d 179, 182. Because the state did not argue any legal error in the trial court's factual innocence analysis, this Court reviews the trial court's ruling for an abuse of discretion.

### Factual Innocence

This case presents this Court's first opportunity to apply La. C.Cr.P. art. 926.2, which governs post-conviction claims of factual innocence. The burden of proof rests on the petitioner, La. C.Cr.P. art. 930.2, and relief can only be granted on the grounds set forth in La. C.Cr.P. art. 930.3.[21]

Code of Criminal Procedure article 926.2 sets forth a two-step process:

B.(1)(a) To assert a claim of factual innocence under this Article, a petitioner shall present ***new, reliable, and noncumulative evidence*** that would be legally admissible at trial and that was not known or discoverable at or prior to trial and that is either:

(i) Scientific, forensic, physical, or nontestimonial documentary evidence.

(ii) Testimonial evidence that is corroborated by evidence of the type described in Item (i) of this Subsubparagraph.

(b) To prove entitlement to relief under this Article, the petitioner shall present evidence that satisfies all of the criteria in Subsubparagraph (a) of this Subparagraph and that, ***when viewed in light of all of the relevant evidence, including the evidence that was admitted at trial*** and any evidence that may be introduced by the state in any response that it files or at any evidentiary hearing, proves by clear and convincing evidence that, had the new evidence been presented at trial, no rational

---

[21] Article 930.2 was amended in 2025 to add that the state "has no burden of proof" in post-conviction proceedings. La. C.Cr.P. art. 930.2.

> juror would have found the petitioner guilty beyond a reasonable doubt of either the offense of conviction or of any felony offense that was a responsive verdict to the offense of conviction at the time of the conviction.

La. C.Cr.P. art. 926.2(B)(1)(a), (b) (emphasis added).

Legislation is the solemn expression of legislative will; thus, the interpretation of legislation is primarily the search for the legislative intent. *State v. Griffin*, 14-1214, p.4 (La. 10/14/15), 180 So. 3d 1262, 1267. When a law is clear and unambiguous and its application does not lead to absurd consequences, it shall be applied as written, with no further interpretation made in search of legislative intent. The starting point for interpretation of any statute is the language of the statute itself. *Id.* at n.2 (applying these principles to the interpretation of articles in the Code of Criminal Procedure).

Under article 926.2(B)(1), the threshold question is whether Duncan presented "new, reliable, and noncumulative evidence that would be legally admissible at trial and that was not known or discoverable at or prior to trial," and that falls within one of the categories identified in article 926.2(B)(1)(a). Professor Carrington's testimony satisfies this prong of the analysis. We have previously held, in the context of a La. C.Cr.P. art. 851 motion for a new trial, that "new" evidence cannot be "merely impeaching." *State v. Ayo*, 14-1933, p.11 (La. 6/30/15), 167 So. 3d 608, 614.

We note that under the unique facts of this case, Professor Carrington's testimony goes beyond mere impeachment of Dr. Hayne and Dr. West, instead providing newly discovered context for how their relationship, methods, monetary incentives, and now-documented history of unreliable forensic conclusions bore directly on the central evidence on which the state's first degree murder case depended.[22] We also find Professor Carrington's testimony and evidence, which is

---

[22] In any event, we have also recognized an exception to the general rule against the use of

based upon years of documentary research and jurisprudential holdings, to be reliable.[23]

Though the word "nontestimonial" is not defined in article 926.2 or the post-conviction articles, this Court has explained in the Sixth Amendment context that "nontestimonial" means "not procured for the primary purpose of creating an out-of-court substitute for trial testimony." *State v. Koederitz*, 14-1526, p.8 (La. 3/17/15), 166 So. 3d 981, 986 (internal marks omitted). Applying that meaning here, the documentary evidence underlying Professor Carrington's testimony—including published research, judicial findings, investigative materials, and documented exonerations related to the work of Dr. Hayne and Dr. West—was not created as an out-of-court substitute for testimony in Duncan's case. Those materials therefore qualify as nontestimonial documentary evidence under article 926.2(B)(1)(a)(i). Professor Carrington's testimony, in turn, qualifies under article 926.2(B)(1)(a)(ii), because it was corroborated by that documentary evidence.

Considering the exceptional circumstances presented in this case and on this unique record, Professor Carrington's testimony, corroborated by nontestimonial documentary evidence, satisfies the first prong of article 926.2(B)(1)(a).

Once the petitioner satisfies the threshold requirements of article 926.2(B)(1)(a), the court proceeds to article 926.2(B)(1)(b). Under that step, the trial court reviews the new evidence "in light of all of the relevant evidence, including the evidence that was admitted at trial. . . " to determine whether the petitioner has proven, by "clear and convincing evidence that, had the new evidence been

---

impeachment evidence where the witness's testimony is "dispositive of the question of guilt or innocence and it appears that had the impeaching evidence been introduced, it is likely that the jury would have reached a different result." *Ayo*, 14-1933, p.10, 167 So. 3d at 613 (citation omitted). That exception would apply here, where the conclusions associated with the two doctors' conclusions supplied the foundation for the state's theory that Haley was bitten, sexually assaulted, and forcibly drowned.

[23] At the post-conviction hearing the state argued that Professor Carrington's testimony did not fall within article 926.2. In the brief to this Court, the state no longer contests this holding.

presented at trial, no rational juror would have found the petitioner guilty beyond a reasonable doubt." La. C.Cr.P. art. 926.2(B)(1)(b) (emphasis added). Under the "clear and convincing" standard, "the existence of the disputed fact must be highly probable or much more probable than its nonexistence." *State in Interest of A.L.D.*, 18-1271, pp.4-5 (La. 1/30/19), 263 So. 3d 860, 863. "Clear and convincing" requires more than a "preponderance" but less than "beyond a reasonable doubt." *Id.*

By its plain language, article 926.2(B)(1)(b) directs that a trial court consider "***all of the relevant evidence***" in undertaking the review required by this second step. This is not simply a review of the "new" evidence admitted during the first step of the inquiry. Because Professor Carrington's testimony satisfies the requirement set forth in article 926.2(B)(1)(a) for the presentation of "new, reliable, and noncumulative evidence that would be legally admissible at trial," the second step requires consideration of all relevant evidence properly admitted at trial and in the post-conviction proceedings, whether or not each additional item of relevant evidence would independently satisfy the threshold requirement. This provision is clear and free of ambiguity. *See*, *e.g.*, *State v. Johnson*, 24-1175, p.2 (La. 3/18/25), 402 So. 3d 1206, 1207 ("Every word, sentence, or provision in a law is presumed to be intended to serve some useful purpose, that some effect is given to each such provision, and that no unnecessary words or provisions were employed.") (citation omitted).

Even though post-trial evolution in scientific understanding of bite mark analysis or pediatric forensic pathology concerning suspected sexual abuse may not independently qualify as "new" under the article 926.2(B)(1)(a) analysis, once the threshold requirement is met, those scientific developments are properly considered as part of "all of the relevant evidence" under article 926.2(B)(1)(b).

As explained above, the state's theory of the case during the 1998 trial was that Duncan attacked and bit Haley, raped her, then drowned her and staged the scene

to cover up her death and avoid being caught. Importantly, as this Court previously recognized, before the now seriously questionable evidence was introduced by Dr. Hayne and Dr. West, the case was considered as a negligent homicide. In our opinion on direct review, this Court explained:

> The state originally planned to charge defendant with negligent homicide. Upon receiving a report from the Mississippi pathologist that conducted the autopsy regarding the extensive and intentional nature of the injuries inflicted on Haley, including the possible bite marks, the state elevated the charges to be asserted against defendant to first degree murder.
>
> The state's case was built on circumstantial evidence. A thorough search of the crime scene revealed neither blood nor semen. Nor was any blood found on defendant's body or attire. The only direct link the prosecution was able to make between the victim's injuries and the defendant was premised on the bite mark evidence.

*Duncan I*, 99-2615, p.8, 802 So. 2d at 542.

Considering the trial record, the post-conviction evidence did not merely challenge isolated portions of the state's case, nor was this a renewed "battle of the experts." Rather, the post-conviction evidence undermined the core factual premises on which the state depended: that Haley's body had bite marks linking Duncan to a violent assault; that her anal injuries proved sexual abuse and supplied a motive for murder; and that she was forcibly drowned as part of that assault or its coverup.

***The Alleged Bite Marks.*** The bite mark evidence was central to the state's case because it was "[t]he only direct link" between Duncan and the injuries observed on Haley's body. *Id*. At the post-conviction hearing, Professor Carrington testified about documentary evidence that came to light after Duncan's trial concerning the reliability of Dr. Hayne's and Dr. West's forensic work, including their working relationship, financial incentives, Dr. Hayne's excessive autopsy volume, false or misleading credentials, and cases in which their conclusions were later associated with wrongful convictions. He explained that this pattern matters here, because Dr. Hayne's autopsy findings changed the direction of the

investigation when he identified marks he suspected to be bite marks and referred the case to Dr. West, whose work has since been widely discredited.

The evidence concerning the West Video further undermines the bite theory. Dr. Levine testified that Dr. West's "direct comparison" method was not approved by the ABFO, and risked creating, destroying, contaminating, or otherwise compromising potential evidence. He further explained that the absence of a photo log made it impossible to determine whether experts who later relied only upon photographs were reviewing Haley's skin before or after Dr. West pressed and dragged Duncan's dental molds against her body. Dr. Freeman likewise testified that the marks on Haley's body lacked the class and individual characteristics necessary to identify them as human bite marks, that it was "scientifically indefensible" to identify those marks as having been made by Duncan, and that the angles shown in the West Video were physically impossible for a human bite.[24] Thus, the post-conviction evidence substantially undermined the only evidence this Court previously identified as directly linking Duncan to Haley's injuries.

***The Alleged Sexual Assault.*** The post-conviction evidence also undermined the state's theory that Haley had been sexually assaulted, which the state contended provided the motive for Duncan to kill Haley. At trial, the state relied heavily on testimony that Haley's anal injuries were severe and consistent only with adult male penetrative rape. But Dr. Bux testified that Dr. Hayne lacked appropriate qualifications and his autopsy was inadequate, poorly documented, and impossible to validate in material respects. Dr. Bux further testified that the pathology of Haley's anus and rectum was not evidence of penetrating trauma but more consistent

---

[24] We expressly decline to make a categorical finding in this case that bite mark evidence is "junk science," as Dr. Freeman testified. However, we find no abuse of discretion in the trial court's determination that Dr. Freeman's testimony was persuasive under the unique facts of this case.

with non-abuse causes such as disease, diaper rash, rough washing, or stooling-related injury.

Dr. Melinek's testimony reinforced that conclusion. She testified that penetration of a toddler by an adult male penis would be expected to cause devastating internal injury and hemorrhage, neither of which was documented in Haley's autopsy or medical records and was not present in the physical evidence found at the scene. She further explained that Haley's anal injuries were superficial, anal dilation is a common post-mortem finding, and medical literature now recognizes several non-abusive conditions that may mimic findings once attributed to sexual abuse in children.

**The Alleged Forcible Drowning.** The post-conviction evidence also called into question the state's proof that Haley was forcibly drowned. Dr. Bux opined that Haley's death was accidental and testified that the injuries one would expect in a forcible drowning were absent. Dr. Melinek similarly testified that Haley's death was an accidental drowning likely associated with seizure risk, recent skull fractures, and post-traumatic epilepsy. She further explained that Dr. Hayne's time-of-death estimate was unreliable and undermined by the absence of rigidity and Haley's recorded body temperature, thereby discrediting the state's coverup theory.

**The Remaining Evidence.** Additional post-conviction evidence weakened the state's trial case. Detective Sasser confirmed investigators found no blood, semen, signs of struggle, cleaning rags, or cleaning agents, and much of Duncan's account was consistent with the physical condition of the apartment.[25]

Critically, the state's sexual assault theory depended on its own experts' testimony that Haley's injuries would have caused substantial blood loss. But the

---

[25] The state argues Duncan did not address the lack of oatmeal in Haley's stomach, which the state contends Duncan "shoved" into her mouth as part of his alleged coverup. *See generally Duncan I*, 99-2615, p.3, 802 So. 2d at 539. We find no abuse of discretion in the trial court failing to give this significant weight, as Dr. Bux testified that it did not "surprise" him that there was no oatmeal in her stomach.

state's own witnesses also testified to the fact that there was an exhaustive search for blood or evidence of cleanup, yet none was ever found. Nor was there any medical evidence that Haley suffered substantial blood loss. This absence of both physical and medical evidence undermines the state's sexual assault theory, which was a linchpin of its case.

In granting relief to Duncan, the trial court recognized the "wide divide between what was presented at the original trial of Petitioner and what could be presented now." We agree and find that divide dispositive here. The post-conviction evidence did not simply offer a competing interpretation of the trial evidence, but instead substantially undermined the core forensic and medical evidence on which the state's theory of first degree murder depended. Therefore, on this record, and after reviewing the new evidence in light of all relevant evidence, we find the trial court did not abuse its discretion in determining that Duncan proved by clear and convincing evidence that had the "new" evidence, in light of all relevant evidence, been presented at trial, no rational juror would have found Duncan guilty of the first degree murder of Haley beyond a reasonable doubt. La. C.Cr.P. art. 926.2(B)(1)(b). In other words, he has proven that it is "much more probable than not" that no rational juror would have found him guilty of the first degree murder of Haley beyond a reasonable doubt. *See A.L.D.*, 18-1271, pp.4-5, 263 So. 3d at 863.[26]

Our jurisprudence recognizes that a non-DNA factual-innocence claim requires an "extraordinarily" high showing that "undermines the prosecution's entire case." *State v. Conway*, 01-2080, p.1 (La. 4/12/02), 816 So. 2d 290, 291 (internal

---

[26] Haley's paternal family members filed an amicus brief in support of Duncan, stating they "believe fully" in his innocence claim and support the grant of relief and his release from confinement.

Haley's mother, Allison, testified at Duncan's bail hearing in support of his release, asserting that after hearing the new evidence presented at post-conviction, she believes the state "made up" the case against Duncan. We note these views only to acknowledge the positions of Haley's surviving immediate family members; they do not factor into our legal analysis under La. C.Cr.P. art. 926.2.

marks omitted). This standard applies in considering Duncan's claim under article 926.2, and the evidence and testimony presented at the post-conviction hearing meet this high standard. *See also State v. Pierre*, 13-0873, pp.9-10 (La. 10/15/13), 125 So. 3d 403, 409 (citing *McQuiggin v. Perkins,* 569 U.S. 383 (2013), for the proposition that actual innocence claims are "rare")).

All experts, including the prosecution experts, testified that Haley would have suffered significant blood loss under the state's theory. Yet the medical evidence failed to establish that Haley suffered such significant blood loss, Detective Sasser testified that he conducted multiple thorough searches of the residence and found no evidence of blood or cleanup, and the state's own timeline did not permit the kind of cleanup that would have been necessary to remove that evidence. Thus, Duncan is able to meet the demanding standard articulated in *Conway* because the evidence allowed under La. C.Cr.P. art. 926.2 so seriously undermines the state's countervailing evidence that the record no longer supports the state's theory of the crime, thereby establishing by clear and convincing evidence that no rational juror would convict Duncan on the record before us.[27]

### Ineffective Assistance of Counsel

Because the trial court did not abuse its discretion in granting relief under La. C.Cr.P. arts. 926.2 and 930.3(8), we pretermit any decision on Duncan's claims of ineffective assistance of counsel. *See State v. Johnson*, 09-1920, pp.2-3 (La.

---

[27] "Factual innocence" is a defined statutory term under La. C.Cr.P. art. 926.2. The statute expressly permits the state to retry a petitioner, after relief is granted under this article, "for the offense of conviction, for a lesser offense based on the same facts, or for any other offense." La. C.Cr.P. art. 926.2(C)(1). By this opinion, this Court applies the language of the statute in granting Duncan relief. Relief under the article is required when a petitioner satisfies the burden of proof under the statutory definition. It is not a judicial declaration concerning whether Duncan is in fact "innocent" in the ordinary sense of its meaning.

10/9/09), 18 So. 3d 1268, 1269 (declining to address DNA innocence claim when defendant received a new trial due to *Brady* violations).[28]

**CONCLUSION**

The trial court did not abuse its discretion in finding that Duncan presented new, reliable, and noncumulative evidence which, when viewed in light of all relevant evidence, proves by clear and convincing evidence that no rational juror would have found him guilty beyond a reasonable doubt of first degree murder had the new evidence been presented at trial. Duncan has met his burden pursuant to La. C.Cr.P. art. 926.2 and is entitled to relief under La. C.Cr.P. art. 930.3(8). The confluence of the unique facts presented at the post-conviction hearing together with the undisputed inconsistencies in the state's theory served to sufficiently undermine the state's entire case against Duncan. We affirm the trial court's judgment vacating Duncan's conviction and sentence. In all other respects, we pretermit consideration of the arguments.

**AFFIRMED. RELIEF GRANTED UNDER LA. C.CR.P. ART. 930.3(8).**

---

[28] Duncan alternatively requests that this Court remand for the trial court to rule on his claim under *Brady v. Maryland*, 373 U.S. 83 (1963). Because we affirm the grant of relief on factual innocence grounds, remand for consideration of that alternative claim is unnecessary.

# SUPREME COURT OF LOUISIANA

## No. 2025-KP-01014

## STATE OF LOUISIANA

## VS.

## JIMMIE C. DUNCAN

*On Writ of Certiorari to the Court of Appeal, Second Circuit,*
*Parish of Ouachita*

**WEIMER, C.J.**, additionally concurs and assigns reasons.

I commend and compliment my colleague for his well-reasoned, statutorily based, and balanced opinion.

I only write to point out that the science-based evidence that was introduced in the post conviction hearing, which resulted in the virtually complete repudiation of the bite mark and sexual abuse evidence, is indeed new evidence as statutorily required.  See La. C.Cr.P. art. 926.2(B).

Long ago, some who were thought to have the best and brightest minds of that time endorsed "trial by water" as a means of determining a person's guilt or innocence.[1]  We now look back at those practices as asinine and absurd, since those who fell victim to those practices often did not survive, regardless of whether they were found guilty or innocent.  Thankfully, as scientific knowledge evolved, there was a realization that these practices had no basis whatsoever in logic, reason, or the search for truth, and the practices were discarded.

---

[1] In Western Judeo-Christian cultures prior to the Enlightenment, a trial or ordeal by water was a test where accused witches were bound and thrown into deep water, the belief being that a person who was baptized into the Chirstian faith would be "accepted" by the water.  The person would then be declared innocent but, due to being bound, occasionally drowned in the process.  If the person floated in the water, then the person was declared guilty of witchcraft as the water had "rejected" the person.  Such a person found guilty would then be executed, usually by hanging or burning.  Encyclopedia Britannica, ordeal, www.britannica.com/topic/ordeal. (Visited 6/16/26)

1

The bite mark evidence and the sexual abuse evidence used in the trial against the accused has proven to be similarly specious. Those practices and methods have been scientifically proven to be of no value and, when relied upon, could lead to false convictions. Those unreliable practices used in the accused's trial should be discarded and no longer have a place in the realm of forensic science or in the ultimate goal of a trial, which is ultimately the search for truth.

The amicus brief of the victim's family bears mention.[1] They have written that they have come to now fully believe in the accused's innocence based on the evidence they observed to be presented at the 2024 post-conviction relief evidentiary hearing, adding that the evidence pointing to the accused's innocence was kept from them, that their belief in his innocence was ignored, and that their position in this matter has been mischaracterized.

This matter demonstrates we cannot be too careful in determining whether the death penalty should be implemented in cases such as this case because of the finality of the sentence and the impossibility of rectification. Such an irreversible and tragic consequence is inimical and deleterious to our system of justice if carried out based on evidence that is devoid of legitimacy. The laws of post-conviction relief have served the purpose of preventing the inappropriate application of the ultimate punishment.

---

[1] An *amicus curiae* brief is written by one who is considered a "friend of the court," and although not a party to the litigation, has a relevant interest in the case's outcome due to having a unique perspective. See Uniform Rules, Courts of Appeal, Rule 2-12.11.

SUPREME COURT OF LOUISIANA

No. 2025-KP-01014

STATE OF LOUISIANA

VS.

JIMMIE C. DUNCAN

On Writ of Certiorari to the Court of Appeal, Second Circuit, Parish of Ouachita


**McCALLUM, J., additionally concurs and assigns reasons.**

I agree with the opinion. I additionally assign reasons regarding some testimony that bite mark evidence is "junk science." In this case, it is not the science but the experts themselves that are undermined. Good science is only as reliable as the expert using it. Science is neutral and its value or reliability is contingent on a qualified expert properly utilizing acceptable methods to administer and analyze the scientific result. Here, the trial experts have been shown to be far removed from implementing proper scientific methods.